**In re William J. STOECKER, Debtor.**

**Bankruptcy No. 89 B 02873.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Oct. 17, 1996.

Robert Radasevich, George M. Hoffman, David A. Eide, Neal Gerber & Eisenberg, Chicago, IL, for Thomas E. Raleigh, Chapter 7 Trustee.

James W. Newbold, Assistant Attorney General, Office of the Attorney General, Chicago, IL, for Illinois Department of Revenue.

## TABLE OF CONTENTS FOR MEMORANDUM OPINION

I. JURISDICTION AND PROCEDURE ...................................... 436
II. APPLICABLE STANDARDS ........................................... 437
 A. Burden of Proof for a Contested Proof of Claim .......................... 437
 B. Summary Judgment Under Federal Rule of Civil Procedure 56 and Federal Rule of Bankruptcy Procedure 7056 ............................ 437
 C. Summary Judgment Implemented by Local Bankruptcy Rule 402 ............ 438
III. UNDISPUTED FACTS AND BACKGROUND ............................. 439
 A. IDOR's Procedures re Bankruptcy Cases of Taxpayer Debtors .............. 439
 B. IDOR's Procedures Applied in the Debtor's Case ......................... 440
 C. IDOR's Other Timely Filed Claims Not in Dispute Here ................∴..... 440
 D. Background Regarding the Instant Contested Claim ....................... 440
 E. The Instant Claim Objection and Proceedings Prior to the Remand Order and Subsequent Thereto ....................................... 442
IV. DISCUSSION ..................................................... 444
 A. Did IDOR Issue the NPL in Violation of the Automatic Stay, Thus Rendering It Void? .............................................. 444
 B. Did Chandler Owe the Use Tax Assessed By IDOR For the Purchase of the Aircraft? ..................................................... 445
 1. Sovereign Immunity Does Not Prevent the Court From Redetermining Chandler's Liability For the Use Tax ............................ 445
 2. The Sale of the Aircraft Was an "Isolated or Occasional Sale" Exempt From Tax ........................................... 449

 3. The Court Will Not Disregard the Separate Legal Entities of Prewitt Leasing and Jack Prewitt & Associates and Thus Find That Prewitt Leasing Was Not an "Occasional" Seller of Aircraft ..........450

 C. Was the Debtor a Responsible Officer Who Willfully Failed to Pay the Use Tax Assessed Against Chandler ................................452

 1. The Law of the Case Doctrine Prevents the Court From Not Considering the NPL as Prima Facie Evidence ......................452

 2. Applicable Statutes and Case Law Regarding Responsible Officer Liability ........................................................453

 3. The Evidence Did Not Show That the Debtor Had Control, Supervision, or Responsibility for Filing Returns and Making Payment of the Tax Allegedly Owed By Chandler ..............................453

 4. The Debtor's Failure to Pay the Tax Was Not Shown To Be Voluntary, Conscious, and Intentional..............................455

 5. The Court Will Not Draw Any Inferences From the Debtor's Invocation of the Fifth Amendment Privilege .............................457

 6. The Use Tax Allegedly Owed By Chandler Arose on September 30, 1988 .........................................................459

 7. The Aircraft Lease/Purchase Agreement Between Chandler & Prewitt Leasing Was Not a Disguised Conditional Sale ...................460

 8. IDOR Failed To Sustain Its Ultimate Burden of Proof .................462

 D. Should the Court Equitably Subordination IDOR's Claim? .................463

 1. The Trustee's Request for Equitable Subordination is Properly Before the Court ........................................................463

 2. Applicable Statute and Case Law Regarding Equitable Subordination.....463

 3. The Evidence Does Not Mandate Equitable Subordination of IDOR's Claim ..........................................................464

V. CONCLUSION.........................................................465

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on a remand order from the United States District Court for the Northern District of Illinois to determine whether William J. Stoecker (the "Debtor"), as a responsible officer of a non-debtor corporation, Chandler Enterprises, Inc. ("Chandler"), willfully failed to pay a use tax assessed against Chandler. A motion for summary judgment on this and related issues was filed by Thomas E. Raleigh, the Chapter 7 trustee (the "Trustee") for the Debtor's estate, which is opposed by the responding creditor claimant, the Illinois Department of Revenue ("IDOR"). For the reasons set forth herein, the Court hereby partially grants the motion for summary judgment. The Trustee's objection to IDOR's claim is sustained in part and the claim is disallowed. The Court holds that Chandler did not owe the assessed use tax in the first instance. Moreover, the Court holds that IDOR has failed to prove that the Debtor willfully failed to pay the use tax. Finally, the Court will not equitably subordinate IDOR's claim under 11 U.S.C. § 510(c).

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334(b) and General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(B).[1] *See In re Stoecker*, 151 B.R. 989, 991 (Bankr. N.D.Ill.1992), *rev'd and remanded*, 179 B.R. 532 (N.D.Ill.1994).

---

1. IDOR does not dispute the Court's jurisdiction to hear an objection to its claim against the Debtor. IDOR contends that the Court lacks jurisdiction to determine the tax liability of a non-debtor corporation such as Chandler. The District Court, in reversing and remanding the matter, held that this Court had the jurisdiction to decide Chandler's liability for the assessed use tax. *See In re Stoecker*, 179 B.R. 532, 541 (N.D.Ill.1994). IDOR has raised the issue at this stage to preserve same for possible appeal. A more detailed address of this argument can be found herein. *See* pp. 445–52 *infra*.

## II. *APPLICABLE STANDARDS*

### A. *Burden of Proof for a Contested Proof of Claim*

■ Pursuant to Federal Rule of Bankruptcy Procedure 3001(f), "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R.Bankr.P. 3001(f); *see also* 11 U.S.C. §§ 501 and 502(a). Claim objectors carry the initial burden to produce some evidence to overcome this rebuttable presumption. *Bank of Bellwood v. Stoecker (In re Stoecker)*, 143 B.R. 879, 883 (N.D.Ill.1992), *aff'd in part vacated in part*, 5 F.3d 1022 (7th Cir. 1993). However, the ultimate burden of persuasion always remains with the claimant to prove entitlement to the claim. *Franchise Tax Board of the State of California v. MacFarlane*, 83 F.3d 1041, 1045 (9th Cir. 1996); *Brown v. Internal Revenue Service (In re Brown)*, 82 F.3d 801, 804–05 (8th Cir.1996); *In re Octagon Roofing*, 156 B.R. 214, 218 (Bankr.N.D.Ill.1993). IDOR's properly filed claim constitutes prima facie evidence of the validity and amount of the claim. The Trustee has the burden of presenting evidence to rebut the prima facie validity. If that burden is satisfied, IDOR then bears the ultimate burden of proving its claim. *See MacFarlane*, 83 F.3d at 1045.

### B. *Summary Judgment Under Federal Rule of Civil Procedure 56 and Federal Rule of Bankruptcy Procedure 7056*

■ In order to prevail on a motion for summary judgment, the movant must meet the statutory criteria set forth in Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. Rule 56(c) reads in part:

> [T]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The primary purpose for granting a summary judgment motion is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Trautvetter v. Quick*, 916 F.2d 1140, 1147 (7th Cir.1990); *Farries v. Stanadyne/Chicago Div.*, 832 F.2d 374, 378 (7th Cir.1987) (quoting *Wainwright Bank & Trust Co. v. Railroadmen's Federal Sav. & Loan Ass'n of Indianapolis*, 806 F.2d 146, 149 (7th Cir. 1986)).

In 1986, the United States Supreme Court decided a trilogy of cases which encourage the use of summary judgment as a means to dispose of factually unsupported claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden is on the moving party to show that no genuine issue of material fact is in dispute. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Matsushita*, 475 U.S. at 585–86, 106 S.Ct. at 1355–56; *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and must identify those portions of the "pleadings, depositions, answers to interrogatories, and affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. Once the motion for summary judgment is supported by a prima facie showing that the moving party is entitled to judgment as a matter of law, Rule 56(e) provides that a party opposing the motion may not rest upon the mere allegations or denials in its pleadings; the response of that party must set forth specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *Doe v. Cunningham*, 30 F.3d 879, 882 (7th Cir.1994); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

All reasonable inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513-14; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355-56; *Peerman v. Georgia-Pacific Corp.,* 35 F.3d 284, 286 (7th Cir.1994); *Cuddington v. Northern Ind. Public Serv. Co.,* 33 F.3d 813, 815 (7th Cir.1994). The existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under applicable law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Frey v. Fraser Yachts,* 29 F.3d 1153, 1156 (7th Cir.1994). "Summary judgment is not an appropriate occasion for weighing the evidence; rather the inquiry is limited to determining if there is a genuine issue for trial." *Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir.1990). However, "[i]f evidence opposing summary judgment is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50, 106 S.Ct. at 2511 (citations omitted); *see also Griffin v. Air Line Pilots Ass'n. Int'l.,* 32 F.3d 1079, 1084 (7th Cir. 1994). When the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment must be granted. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

### C. *Summary Judgment Implemented by Local Bankruptcy Rule 402*

■ Local Rule 402.M of the Bankruptcy Rules adopted for the Northern District of Illinois requires the party moving for summary judgment to file, among other things, a detailed statement ("402.M statement") of material facts that the movant believes are uncontested. Local Bankr.R. 402.M.[2] The 402.M statement "shall consist of short numbered paragraphs, including, within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. Failure to submit such a statement constitutes grounds for denial of the motion." *Id.*

■ The Trustee has filed a 402.M statement that substantially complies with the requirements of this Rule. The Trustee filed a 402.M statement that contained numbered paragraphs setting out assertedly uncontested facts. Each paragraph in the Trustee's 402.M statement refers to exhibits admitted into evidence at the original evidentiary hearings in this matter, held on July 30, and August 27, 1992, and makes reference to the testimony received at those hearings.

■ The party opposing a summary judgment motion is required by Local Rule 402.N to respond ("402.N statement") to the movant's 402.M statement, paragraph by paragraph, and to set forth any material facts that would require denial of summary judgment, specifically referring to the record for support of each denial of fact. Local Bankr.R. 402.N.[3] The 402.N statement filed

---

2. M. Motions for Summary Judgment; Moving Party.

With each motion for summary judgment filed pursuant to Fed.R.Civ.P. 56 (Fed. R.Bankr.P. 7056), the moving party shall serve and file—
(1) any affidavits and other materials referred to in Fed.R.Civ.P. 56(e);
(2) a supporting memorandum of law; and
(3) a statement of material facts as to which the moving party contends there is no genuine issue and that entitles the moving party to judgment as a matter of law that includes:
(a) a description of the parties; and
(b) all facts supporting venue and jurisdiction in this Court. The statement of facts referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. Failure to submit such a statement constitutes grounds for denial of the motion.
Local Bankr.R. 402.M.

3. N. Motions for Summary Judgment; Opposing Party.

Each party opposing a motion under Fed. R.Civ.P. 56 (Fed.R.Bankr.P. 7056) shall serve and file the following:
(1) any opposing affidavits and other materials referred to in Fed.R.Civ.P. 56(e);
(2) a supporting memorandum of law; and
(3) a concise response to the movant's statement of facts that shall contain:
(a) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon; and

by IDOR complies with Rule 402.N. In the filing, IDOR responds "to each numbered paragraph in the moving party's statement" and makes "specific references to the affidavits, parts of the record, and other supporting materials relied upon." Local Bankr.R. 402.N.(3)(a). IDOR has also complied with Local Bankr.R. 402.N.(3)(b) and set forth additional facts for purposes of this motion.

 Compliance with Local Rules 402.M and 402.N is not a mere technicality. Courts rely greatly upon the information presented in these statements in separating the facts about which there is a genuine dispute from those about which there is none. *See American Ins. Co. v. Meyer Steel Drum, Inc.,* 1990 WL 92882 at *7 (N.D.Ill. June 27, 1990). Statements that embody factual or legal conclusions are not accorded any weight in summary judgment motions. *See Maksym v. Loesch,* 937 F.2d 1237, 1243 (7th Cir.1991); *Davis v. City of Chicago,* 841 F.2d 186, 189 (7th Cir.1988). Furthermore, the statements required by Rule 402

> are not merely superfluous abstracts of the evidence. Rather, they are intended to alert the court to precisely what factual questions are in dispute and point the court to specific evidence in the record that supports a party's position on each of these questions. They are, in short, roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information on its own.

*Waldridge,* 24 F.3d at 923.

## III. UNDISPUTED FACTS AND BACKGROUND

The undisputed facts with respect to the Trustee's motion for summary judgment, as gleaned from the Trustee's 402.M statement, IDOR's 402.N statement, the Trustee's reply to IDOR's 402.N statement, and from the entire record before the Court are as follows:

> (b) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon. All material facts set forth in the statement required of the moving

On February 21, 1989, an involuntary proceeding under Chapter 11 of the Bankruptcy Code was initiated against the Debtor. On March 20, 1989, Thomas E. Raleigh was appointed Chapter 11 Trustee of the Debtor's estate. Thereafter, on February 26, 1990, this case was converted to a Chapter 7, and Raleigh was reappointed as the Chapter 7 Trustee. By order dated March 5, 1990, the Court set the 11 U.S.C. § 341 meeting of creditors for March 28, 1990. That order provided that all proofs of claim were to be filed within 90 days after the § 341 meeting, on or before June 26, 1990. On November 28, 1990, pursuant to an agreed order, the Debtor consented to the denial of his discharge.

### A. IDOR's Procedures re Bankruptcy Cases of Taxpayer Debtors

It is the practice of IDOR's bankruptcy unit, upon receiving notice that an individual has filed, voluntarily or involuntarily, for bankruptcy relief, to research all potential liability that person may have to IDOR by running a computer search using the debtor's social security number. (Tr. (MacDonald) 103).[4] Such a search reveals the names and Illinois business tax numbers of all corporations of which a debtor is an officer, provided that the corporation is registered with IDOR. *Id.* Once the computer search reveals that a debtor in bankruptcy is an officer of a corporation registered in Illinois, two things happen. First, a search is made to see if the corporation has outstanding taxes due IDOR. (Tr. (MacDonald) 103–04). If it is determined that there are outstanding corporate taxes and the debtor may be held personally liable for the corporate taxes as a responsible officer, the bankruptcy unit files a claim in the bankruptcy case. *Id.* Second, the bankruptcy unit encodes IDOR's computer system with information indicating that an officer of a corporation is in bankruptcy so that any employee of IDOR who checks the infor-

> party will be deemed to be admitted unless controverted by the statement of the opposing party.
> Local Bankr.R. 402.N.

4. Transcript references are to the testimony received during the 1992 evidentiary hearings.

mation concerning the corporation will know immediately that the officer is in bankruptcy. (Tr. (Petersen) 111).

The actions set forth above are performed for a number of reasons including the purpose of informing IDOR's auditors of the pendency of any bankruptcy case involving an officer of any corporation against which they may conduct an audit. *Id.* If an auditor finds that an officer of a corporation that he is auditing is in bankruptcy, it is IDOR's procedure to require the auditor to immediately advise the bankruptcy unit of any audit so that a claim can be promptly filed. (Tr. (Russell) 43).

### B. *IDOR's Procedures Applied in the Debtor's Case*

IDOR's bankruptcy unit in Chicago received notice of the Debtor's bankruptcy filing sometime shortly after the filing of the involuntary petition. Upon receipt of the notice of the Debtor's bankruptcy filing, Lawrence MacDonald ("MacDonald") of IDOR's bankruptcy unit, was assigned the task of researching the Debtor's liability to IDOR and filing the appropriate claims. (Tr. (MacDonald) 102–03). As part of MacDonald's research, he ran the Debtor's social security number through IDOR's computer system and determined that there were a number of corporations of which the Debtor was an officer. (Tr. (MacDonald) 103). The corporations associated with the Debtor included The Cook's Cupboard, Inc., Eagle Line, Inc., and a number of other corporations. (Tr. (MacDonald) 103–04). MacDonald's search of IDOR's then extant database revealed no outstanding tax liability owed by corporations other than The Cook's Cupboard, Inc. and Eagle Line, Inc. (Tr. (MacDonald) 104). IDOR's computer records containing the registration information concerning these other corporations were encoded to show that the Debtor, as an officer,

was in bankruptcy. (Tr. (Petersen) 115–16). At the time this was done in 1989, IDOR had no registration for Chandler that could be encoded to show that the Debtor, as an officer of Chandler, was in bankruptcy. *Id.* Apparently, Chandler was not registered with IDOR when the search was performed. *Id.*

### C. *IDOR's Other Timely Filed Claims Not in Dispute Here*

On July 25, 1989, prior to conversion of the case to a Chapter 7, IDOR filed three proofs of claim in the amounts of $12,667.00, $1,330.21, and $222.03. These proofs of claim were for taxes owed by the Debtor as the responsible officer of The Cooks' Cupboard, Inc.[5] and Eagle Line, Inc. (IDOR's Group Exhibit No. 16).[6] Neither of these corporations' claimed unpaid taxes are involved in this matter. Rather, the contested claim at bar arises in connection with a claimed unpaid Illinois use tax assessed against Chandler.[7]

### D. *Background Regarding the Instant Contested Claim*

On September 30, 1988, Chandler exercised a buy-out option under a previously existing aircraft Lease/Purchase Agreement, executed on June 7, 1988 between Prewitt Leasing, Inc. ("Prewitt Leasing"), a company based in Texas, and Chandler. (Trustee's Exhibit No. 10).[8] Pursuant to this agreement, Chandler, an Illinois corporation with offices in Oak Forest, Illinois, acquired the title to a 1987 Dassault Falcon 50 Aircraft (the "Aircraft") from Prewitt Leasing. (IDOR's Exhibit No. 7). The Aircraft was based in Illinois but not registered with the Illinois Department of Transportation. At the time of the Aircraft purchase, the Debtor was the president and sole director of Chandler. (IDOR's Group Exhibit No. 19).

---

**5.** On November 17, 1989, IDOR filed an amended proof of claim asserting additional taxes owed by the Debtor as responsible officer of The Cook's Cupboard, Inc.

**6.** References are to IDOR's exhibits admitted into evidence at the first evidentiary hearings in this matter, which occurred on July 30, and August 27, 1992.

**7.** IDOR's claim against Chandler is based on a use tax assessed under Section 3 of the Illinois Use Tax Act. *See* Ill.Rev.Stat., ch. 120, ¶ 439.3 (codified as 35 ILCS 105/3).

**8.** References are to the Trustee's exhibits admitted into evidence at the first evidentiary hearings.

The chain of title to the Aircraft indicates that also on September 30, 1988, Jack Prewitt & Associates, Inc. ("Jack Prewitt & Associates") transferred title to Prewitt Leasing.[9] (IDOR's Exhibit No. 6). Title was previously transferred to Jack Prewitt & Associates by Opex Aviation, Inc. on June 1, 1988. (IDOR's Exhibit No. 5). Opex Aviation, Inc. had obtained title to the Aircraft from Bezwada Investments, Inc., an Australian company ("Bezwada"), on May 30, 1988. (Trustee's Exhibit No. 8). Due to a mistake on the part of Raymond Prewitt or William White, a now deceased employee of Jack Prewitt & Associates, title to the Aircraft was incorrectly transferred from Opex Aviation, Inc. to Jack Prewitt & Associates. (Jack Prewitt Dep. 41–44). Instead, on June 1, 1988, title should have been transferred from Opex Aviation, Inc. to Prewitt Leasing. *Id.*

Neither Chandler nor Prewitt Leasing paid any sales or use tax in connection with Chandler's purchase of the Aircraft. The purchase of the Aircraft was financed by NEMLC Leasing Corporation ("NEMLC") of Boston, Massachusetts. At NEMLC's request, John Anderson ("Anderson"), an attorney with the law firm of Lord, Bissell & Brook, who acted as counsel for Chandler and Grabill Corporation, a company that leased the Aircraft from Chandler, issued an opinion letter on September 30, 1988, concluding that, under Illinois law, there was no sales or use tax assessable or payable as a result of Chandler's purchase of the Aircraft because it constituted an occasional sale exempt from such tax. (Trustee's Exhibit No. 3). Anderson's legal opinion was supported by a "Certificate Re Occasional Seller Exemption from Illinois Sales and Use Tax," dated September 30, 1988, and executed by a vice president of Prewitt Leasing. (Trustee's Exhibit No. 4). Anderson never sought a private letter ruling from IDOR concerning the taxability of the Aircraft purchase. (Tr. (Anderson) 145). A copy of Anderson's opinion was provided to Lawrence Pluhar ("Pluhar"), the Debtor's chief adviser regarding financial matters relating to the Debtor's corporations. (Tr. (Anderson) 130–31). Until some time in December 1988, Chandler continued to lease the Aircraft to Grabill Corporation, a corporation owned by the Debtor. (IDOR's Exhibit Nos. 8 and 9).

Prior to the sale to Chandler, Prewitt Leasing had sold only one other aircraft. (Trustee's Exhibit No. 4). At the time it executed the "Certificate Re Occasional Seller Exemption from Illinois Sales and Use Tax," Prewitt Leasing was engaged only in the business of leasing aircraft. *Id.*

In approximately March 1990, Mark Russell ("Russell") of IDOR's audit division in Springfield, Illinois, commenced an investigation into Chandler's purchase of the Aircraft to determine whether it was subject to Illinois state use tax. (Tr. (Russell) 52). At that time and at all times relevant to this Opinion, Russell, as an employee of IDOR, had access to the records of the Illinois Secretary of State which indicated that the Debtor was an officer and director of Chandler. (IDOR's Exhibit Nos. 19 and 20). As a part of his assignment, Russell obtained a report of various aircraft purchased by Illinois residents from a company named Aerofax. (Tr. (Russell) 16). Aerofax is a company that obtains reports from the Federal Aviation Administration in Oklahoma City of all sales of aircraft in the United States and disseminates these reports to all parties subscribing to its reporting service. *Id.* The Aerofax report showed a transaction in which title was transferred to Jack Prewitt & Associates, out of Bedford, Texas, to Chandler in Oak Forest, Illinois. (Tr. (Russell) 17).

Chandler never registered with IDOR nor did it file any tax returns with IDOR, including any tax returns with respect to its purchase of the Aircraft. (Tr. (Russell) 41–42). After Chandler acquired the Aircraft, it did not register the Aircraft with the Illinois Department of Transportation's Division of

---

**9.** IDOR fails to deny or admit this statement in its 402.N statement. The failure to properly or adequately controvert proper assertions in the 402.M statement of facts results in the assertions being deemed admitted. *South Cent. Bank & Trust Co. v. Citicorp Credit Servs., Inc.,* 863 F.Supp. 635, 643 n. 10 (N.D.Ill.1994). *Accord Davis v. Frapolly,* 756 F.Supp. 1065, 1069 n. 4 (N.D.Ill.1991). Consequently, pursuant to Local Bankr.R. 402.N(3)(b), this material fact set forth by the Trustee is deemed to be admitted because same has not been controverted.

Aeronautics. (IDOR's Exhibit No. 21). Furthermore, it is undisputed that Chandler never sought from IDOR a determination that the purchase of the Aircraft was exempt from tax.

IDOR determined that Chandler owed an unpaid use tax, and therefore assessed a use tax totaling $836,500 (plus interest and penalties) against Chandler for the purchase of the Aircraft. (IDOR's Exhibit No. 4). On March 7, 1990, and June 7, 1990, IDOR sent Chandler two letters demanding payment of the use tax. (IDOR's Exhibit Nos. 3 and 4). IDOR did not receive a response to either letter. (Tr. (Russell) 22). In June 1990, Russell learned that the Debtor was an officer of Chandler and, at least potentially, a "responsible officer" within the meaning of the Illinois Retailers' Occupation Tax Act.[10] (Tr. (Russell) 59–60). Thereafter, on September 7, 1990, IDOR issued a Notice of Tax Liability ("NTL") to Chandler for the use tax, plus penalties and interest, in the total amount of $1,378,507.37. (IDOR's Exhibit No. 10).

On June 15, 1991, IDOR issued a Notice of Penalty Liability ("NPL")[11] against the Debtor, together with penalties and interest in the total amount of $1,476,196.86. (IDOR's Exhibit No. 1 at 2). The NPL provided, in part, that "[IDOR] hereby gives its notice that a penalty equal to the amount of the unpaid total liability set forth below is to be assessed against you personally." *Id.* Also on June 15, 1991, IDOR issued a Notice of Lien to the Debtor. (Trustee's Exhibit No. 5). On September 25, 1991, IDOR issued a demand to the Debtor for full and immediate payment of the use tax liability claimed. (IDOR's Exhibit No. 13). On October 3, 1991, IDOR recorded with the Cook County Recorder of Deeds a lien in the amount of $1,476,196.86, representing the assessed use tax, penalties, and interest. (Trustee's Exhibit No. 6).

### E. *The Instant Claim Objection and Proceedings Prior to the Remand Order and Subsequent Thereto*

In January 1992, Brenda Towers, supervisor of the notice of penalty liability section of IDOR, was advised that the Debtor had filed bankruptcy (Tr. (Towers) 98). On January 21, 1992, nearly two years after IDOR began its investigation and more than one and one-half years after the claims bar date, and approximately one and one-half years after Russell discovered that the Debtor was an officer of Chandler, and almost three years after IDOR first received notice that the Debtor was in bankruptcy, IDOR filed the proof of claim that is the subject of this claim objection. (IDOR's Exhibit No. 17).[12] The

---

**10.** *See* Ill.Rev.Stat., ch. 120, ¶ 452½ (1991), renumbered as 35 ILCS 120/13.5 (1992). The Retailers' Occupation Tax Act is incorporated in the Use Tax Act pursuant to Section 12, Ill.Rev.Stat., ch 120, ¶ 439.12, renumbered 35 ILCS 105/12 (effective until January 1, 1994). Effective January 1, 1994, responsible officer liability for use tax was repealed. *See* 35 ILCS 105/12.

**11.** The only copy of the NPL furnished to this Court is the one admitted into evidence at the first evidentiary hearings as IDOR's Exhibit No. 1. That copy of the NPL is difficult to read because it is blurred in parts. The date on the blurred NPL appears to be August 15, 1991, which is the date the parties and the Court have utilized. However, it appears that the date of the NPL is June 15, 1991. That the NPL was issued on June 15, 1991, is confirmed by both the certificate of mailing and envelope attached to IDOR's Exhibit No. 1, both of which indicate mailing on June 17, 1991. (IDOR's Exhibit No. 1 at 3 and 5). Further, the Notice of Lien mailed to the Debtor is dated June 15, 1991, and the total amount of alleged tax, penalties, and inter-

est through June 15, 1991, is the same as the total on the NPL. (Trustee's Exhibit No. 5).

**12.** The amount claimed by IDOR pursuant to its amended claim is as follows: a 11 U.S.C. § 507(a)(7) priority claim of $911,769 consisting of $868,351 in use tax and $43,418 in pre-petition interest. IDOR concedes that the penalty portion of its claim, namely, $260,505 is not entitled to priority, and in fact, is subordinated to claims of general unsecured creditors pursuant to 11 U.S.C. § 726(a)(4).

The total amount in the original claim was $1,476,197. (IDOR's Exhibit No. 17). The difference in the amounts set forth in the original claim and the amended claim constitutes a reduction in interest. The NPL included interest calculated through June 15, 1991, which included 28 months of post-petition interest at 1.25% per month on the outstanding tax amount of $868,351, which totaled $303,923. IDOR deducted this sum from the $347,341 in interest in the original claim, leaving a balance of $43,418 in claimed interest per the amended claim.

The Trustee contends that IDOR's Exhibit No. 4 shows an $11,950,000 purchase price for the

basis for IDOR's claim is the Debtor's purported personal liability as a "responsible officer" of Chandler for its purchase of the Aircraft without paying retailers' occupation tax/use tax (Ill.Rev.Stat., ch. 120, ¶ 440 *et seq.* and ¶ 439.1 *et seq.* (1991)). The Trustee objected to IDOR's claim, and on July 30, and August 27, 1992, the Court held evidentiary hearings.

On November 25, 1992, the Court entered a Memorandum Opinion and Order finding that IDOR had failed to establish that the Debtor willfully failed to pay or owed the responsible officer penalty resulting from Chandler's failure to pay the claimed use tax. *See Stoecker*, 151 B.R. at 1000–01. Further, the Court found that IDOR's claim was untimely and would not be allowed. *Id.* at 996–98.

The Court's decision was appealed to the United States District Court for the Northern District of Illinois. On August 31, 1994, Judge Andersen reversed the Court's finding that the bar date for filing claims in the Debtor's Chapter 7 case applied to IDOR's priority tax claim under 11 U.S.C. § 507(a)(7),[13] and reversed the Court's decision to disallow the claim on the merits. *See Stoecker*, 179 B.R. at 533–39. Further, the District Court remanded this matter to determine whether the Debtor was a responsible officer who willfully failed to pay an assessed tax against a non-debtor corpora-

tion. *Id.* at 544. The District Court suggested that the Court could, but was not obligated to, receive additional evidence on the issue of whether the Debtor willfully failed to pay the alleged use tax. *Id.* The District Court held that IDOR's late-filed priority tax claim, if allowed, under 11 U.S.C. § 507, may be entitled to distribution under 11 U.S.C. § 726(a)(1). *Id.* at 538–39. The District Court further stated that if the Court allows IDOR's amended claim, it must determine whether the claim should be equitably subordinated. *Id.* at 539, 544. The Trustee's request for certification to allow an immediate appeal to the Seventh Circuit was denied. *Id.* at 544.

The District Court's remand order subsequently was docketed and the matter was set for a status hearing. The Trustee moved for summary judgment after the contested claim was set for trial and various prehearing orders were entered. On April 29, 1996, the Court held a hearing pursuant to the District Court's order of remand. At that hearing, the parties submitted the testimony and exhibits from the 1992 hearings, designated deposition transcripts and exhibits, and offered additional exhibits. No witnesses testified. The matter was subsequently taken under advisement after the parties submitted additional post-hearing briefs.

The Trustee contends that his objection to IDOR's claim should be sustained by the

---

Aircraft, and hence, the use tax at the effective statutory tax rate of 7% would amount to $836,500. IDOR maintains that the $868,351 figure is correct, as calculated at 7% based upon a $12,405,016 purchase price for the Aircraft. (IDOR's Exhibit No. 10). The Trustee points out this discrepancy in the amount of the purchase price for the Aircraft in IDOR's Exhibit Nos. 4 and 10, and states that IDOR has failed to offer an adequate explanation for the different figures.

In its post-trial brief, IDOR states that on June 7, 1990, it sent Chandler a letter in which IDOR noted that the tax base for the Aircraft purchase was $11,950,000, and therefore the tax would be $836,500. (IDOR's Exhibit No. 4). Thereafter, IDOR contends that it obtained additional information from Jack Prewitt & Associates and issued the NTL calculated tax on a tax base of $12,405,016. (IDOR's Exhibit No. 10).

The Court finds that Chandler's purchase price for the Aircraft was $12,405,016. Pursuant to the Aircraft Lease/Purchase Agreement, Chandler had an option to buy the Aircraft for $12,405,-

016. (IDOR's Exhibit No. 3, Art. II, ¶ 6). Chandler did, in fact, exercise the buy out option. (IDOR's Exhibit No. 8). Further, Chandler, at the time it leased the Aircraft to Grabill, stated that its acquisition cost of the Aircraft was $12,405,016. (IDOR's Exhibit No. 8 at 00000002332). Hence, the Court finds that the evidence demonstrates Chandler acquired the Aircraft for $12,405,016 and the amount of $868,351 set forth in the NTL and in IDOR's amended claim is a correct computation of the unpaid use tax claimed by IDOR to be owed, but unpaid, by Chandler.

13. The Bankruptcy Code has been amended since this case was filed in 1989, and has changed the designations of certain sections and subsections at issue in this contested proceeding. Section 507(a)(7) was recodified as § 507(a)(8). References to sections and subsections of the Bankruptcy Code in this Opinion, however, are to the text of the Code in effect when the case was filed in 1989.

Court on the following grounds: (1) the NPL, which was issued on June 15, 1991, was issued in violation of the automatic stay, and is thus void and cannot form the basis of a claim against the Debtor's estate; (2) Chandler was not liable for the alleged tax in the first instance; (3) the evidence demonstrates that the Debtor was not a "responsible officer" who willfully failed to pay the use tax allegedly owed; and (4) IDOR's claim is untimely. Additionally, the Trustee argues that if the Court finds IDOR's claim proper, it should be equitably subordinated pursuant to 11 U.S.C. § 510(c). The Court will address the bases for the Trustee's objection to IDOR's claim in turn.[14]

## IV. DISCUSSION

### A. Did IDOR Issue the NPL in Violation of the Automatic Stay, Thus Rendering It Void?

■ The Trustee contends that IDOR violated the automatic stay in the following post-petition instances: (1) when it issued the NPL against the Debtor on June 15, 1991; (2) when it made the demand for full payment of the NPL from the Debtor on September 25, 1991; and (3) when it recorded the lien against the Debtor on October 3, 1991.[15] IDOR does not dispute that it took such actions. Rather, IDOR argues that because the Debtor's discharge was denied on November 28, 1990, those actions did not violate the automatic stay by virtue of 11 U.S.C. § 362(c)(2)(C). Pursuant to § 362(c), the automatic stay is no longer in effect under the following circumstances:

(c) Except as provided in subsections (d), (e), and (f) of this section—

(1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate; and

(2) the stay of an other act under subsection (a) of this section continues until the earliest of—

(A) the time the case is closed;

(B) the time the case is dismissed; or

(C) if the case is a case under chapter 7 of this title concerning an individual ..., *the time a discharge is* granted or *denied.*

11 U.S.C. § 362(c) (emphasis supplied).

The Trustee argues that § 362(c)(2)(C) does not apply to the matter at bar because IDOR seeks to employ the NPL to obtain property of the bankruptcy estate, not merely to proceed against the Debtor and his post-petition property. The Trustee contends that because IDOR is now seeking to obtain satisfaction of its claim from property of the estate, relying on the prima facie validity that attached to the NPL, that the post-petition NPL issued to the Debtor violates the automatic stay. The Trustee states that it is undisputed that the assets from which IDOR seeks recovery on its claim are funds in the Trustee's possession realized from the liquidation of the Debtor's prepetition property, and constitute property of the estate. According to the Trustee then, the denial of the Debtor's discharge is irrelevant to IDOR's claim against the estate because § 362(c)(1) and not § 363(c)(2)(C) applies in this case. As such, the Trustee argues the

14. The Court previously sustained the Trustee's objection that IDOR's claim is untimely. *See Stoecker,* 151 B.R. at 996–98. However, the District Court reversed this Court's decision on this issue. 179 B.R. at 539. Accordingly, the Court is bound to follow that ruling as law of the case. *See Cole Energy Dev. Co. v. Ingersoll–Rand Co.,* 8 F.3d 607, 609 (7th Cir.1993) (law of the case doctrine requires lower court judge to comply with rulings made by higher court in the same case). The Trustee has reasserted this ground at this stage solely to preserve the issue in the event of future appeals. This Court will not further address this issue.

15. At the time IDOR took the actions in question, there was in effect the automatic stay provided in

Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a). Section 362(a) provides in relevant part, as follows:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of—

. . . . .

(4) any act to create, perfect, or enforce any lien against property of the estate.

11 U.S.C. § 362(a)(4) (1992). The intended effect of the automatic stay is to preserve the status quo as of the date of the bankruptcy filing. *See In re Carlson,* 189 B.R. 454, 458 (Bankr.N.D.Ill. 1995), *aff'd,* 198 B.R. 949 (N.D.Ill.1996).

automatic stay, which prevents actions taken against property of the estate, was still in effect when the NPL was issued, currently remains in effect, the actions taken violated the stay, and the NPL is void.

▮ IDOR claims that when it issued the NPL to the Debtor, made demand upon him, and recorded the lien, it did so against the Debtor and not against the estate. Thus, IDOR concludes that § 363(c)(2)(C) applies and the automatic stay was not in effect when it took these three actions against the Debtor. IDOR maintains that it never asserted that this lien was against the Trustee or property of the estate, and thus, there was no violation of the stay.

The Court agrees with IDOR's position because it was not until January 21, 1992, that IDOR sought to recover its claim from property of the bankruptcy estate by filing the instant contested claim. The Trustee's argument that IDOR's actions were against the estate and not against the Debtor and that therefore § 362(c)(1) applies is without merit. IDOR only sought to recover on its claim from property of the estate when it filed the instant contested claim—an act not in violation of the automatic stay. Therefore, § 362(c)(2)(C) is applicable in this case at bar, the automatic stay was no longer in effect, and the NPL is not void.

On November 28, 1990, the Debtor consented to the denial of his discharge. All of these action taken by IDOR were taken to perfect an interest in property of the Debtor. All these actions occurred in 1991. Accordingly, pursuant to the plain meaning of the statutory language contained in § 362(c)(2)(C), the automatic stay was not in effect as to the Debtor and any post-petition property of the Debtor when these actions were taken. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989) (holding that plain meaning of legislation should be conclusive). Therefore, the NPL is not void because the automatic stay as to the Debtor and his property was no longer in effect as of November 28, 1990. Hence, the Court finds that IDOR's actions were not in violation of the automatic stay.

### B. Did Chandler Owe the Use Tax Assessed By IDOR For the Purchase of the Aircraft?

The Court next must determine whether Chandler actually owed the assessed use tax for the purchase of the Aircraft. IDOR asserts that the United States Supreme Court has decided two cases that address the issue of sovereign immunity since the District Court's decision, in which the District Court held that this Court properly found that it had jurisdiction under 11 U.S.C. § 505(a) to determine the tax liability of a non-debtor, third party such as Chandler.[16] Accordingly, IDOR maintains that the Court should reconsider that earlier decision based upon these Supreme Court cases.

### 1. Sovereign Immunity Does Not Prevent the Court From Redetermining Chandler's Liability For the Use Tax

Initially, the Court must address IDOR's argument that the Court is precluded under the principle of sovereign immunity from redetermining Chandler's liability for the use tax. This argument was previously raised and rejected by both this Court and the District Court. *See Stoecker,* 151 B.R. at 998–99; *Stoecker,* 179 B.R. at 541. Section 106 of the Bankruptcy Code was amended by the Bankruptcy Reform Act of 1994.[17] *See*

---

16. *Stoecker,* 179 B.R. at 541; *see also Stoecker,* 151 B.R. at 998–99. The Court stands by its reasoning contained therein, and will not repeat its analysis and discussion.

17. Section 113 of the Bankruptcy Reform Act provides in relevant part:

Section 106 of title 11, United States Code, is amended to read as follows:

(a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following

(1) Sections 105, 106, 107, 108, 303, 346, 362, 363, 364, 365, 366, 502, 503, 505, 506, 510, 522, 523, 524, 525, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 722, 724, 726, 728, 744, 749, 764, 901, 922, 926, 928, 929, 944, 1107, 1141, 1142, 1143, 1146, 1201, 1203, 1205, 1206, 1227, 1231, 1301, 1303, 1305, and 1327 of this title.

Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, § 113, 108 Stat. 4106 (1994). Most significantly, the amendment to § 106 applies retroactively. *Id.* § 702(b)(2)(B) ("The amendments made by sections 113 and 117 shall apply with respect to cases commenced under title 11 of the United States Code *before,* on, and after the date of the enactment of this Act.") (emphasis supplied).

 Under § 106(a), as amended, sovereign immunity has been expressly abrogated as to contested claims like the instant claim, which IDOR seeks to have allowed under 11 U.S.C. § 502 and which, though late-filed, IDOR argues should be afforded priority under 11 U.S.C. § 507(a)(7). Amended § 106(b) expressly deems the filing of a proof of claim by a governmental unit to constitute a waiver of sovereign immunity with respect to any claim (like a § 362(a) violation) that is property of the estate and that arose out of the same "transaction or occurrence" out of which the government unit's claim arose.

IDOR cites to *Seminole Tribe of Florida v. Florida,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) in support of its proposition that the Court is precluded from rede-

termining Chandler's tax liability. Therein, the Court specifically held that the Indian Commerce Clause does not grant Congress the power to abrogate states' sovereign immunity.[18] *Seminole* involved the Indian Gaming Regulatory Act (the "Act"),[19] which permitted an Indian tribe to conduct certain gaming activities within a state only if the tribe and the state first entered into a compact prescribing the conditions under which such activities would be conducted. The Act imposed on states a duty to negotiate with tribes in good faith in an attempt to form such pacts.[20] A tribe that believed a state had not negotiated in good faith could bring an action in federal court against that state.[21]

Pursuant to the Act, the Seminole Tribe brought suit against the State of Florida and its governor, alleging a failure to negotiate a gaming compact in good faith. The defendants moved to dismiss the action on the basis of sovereign immunity. The motion was denied. On interlocutory appeal, the Eleventh Circuit reversed the district court, holding that the action against both defendants was barred by the Eleventh Amendment.[22] The Supreme Court affirmed the

(2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.

(3) The court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages. Such order or judgment for costs or fees under this title or the Federal Rules of Bankruptcy Procedure against any governmental unit shall be consistent with the provisions and limitations of section 2412(d)(2)(A) of title 28.

(4) The enforcement of any such order, process, or judgment against any governmental unit shall be consistent with appropriate nonbankruptcy law applicable to such governmental unit and, in the case of a money judgment against the United States, shall be paid as if it is a judgment rendered by a district court of the United States.

(5) Nothing in this section shall create any substantive claim for relief or cause of action not otherwise existing under this title, the Federal Rules of Bankruptcy Procedure, or nonbankruptcy law.

(b) A governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a

claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose.

(c) Notwithstanding any assertion of sovereign immunity by a governmental unit, there shall be offset against a claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

18. The Court noted that no principled distinction can be drawn between the Indian Commerce Clause and the Interstate Commerce Clause. No discussion of the Bankruptcy Clause was made in the majority opinion, although it was referenced in Justice Stevens' dissent. *See* 116 S.Ct. at 1142.

19. 25 U.S.C. § 2701 *et seq.*

20. 25 U.S.C. § 2710(d)(3)(A).

21. 25 U.S.C. § 2710(d)(7)(A)(i), (B)(i).

22. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity,

dismissal. The Court held that the Eleventh Amendment prevents Congress, acting pursuant to its Article I powers, from subjecting unconsenting states to suits brought by private parties in federal court. The Court also held that the governor and the State of Florida were immune from suit. The Court opined that Congress could not statutorily abrogate sovereign immunity for the states in the exercise of its Article I powers—even as to matters within the exclusive control of the federal government. Thus, the Court held that the Indian Gaming Regulatory Act's provision permitting tribes to sue unconsenting states in federal court was unconstitutional.

Next, IDOR cites to the Supreme Court's vacatur of *In re Merchants Grain, Inc.,* 59 F.3d 630 (7th Cir.1995), *vacated sub nom. Ohio Agric. Commodity Depositors Fund v. Mahern,* ___ U.S. ___, 116 S.Ct. 1411, 134 L.Ed.2d 537 (1996). IDOR contends that to the extent that *Seminole* left any question as to the applicability of its holding to Congressional abrogation of sovereign immunity under the Bankruptcy Clause, the issue was clarified when the Supreme Court granted certiorari in *Merchants Grain,* reversed the Seventh Circuit's decision, and remanded the case for further consideration in light of *Seminole.* In *Merchants Grain,* the Seventh Circuit permitted a bankruptcy trustee to maintain an action against an agency of the State of Ohio for the recovery of alleged preferential transfers.

IDOR contends that in light of *Seminole* and *Merchants Grain,* there are only two instances when a bankruptcy court would have jurisdiction over a proceeding involving a state. According to IDOR, the first instance would be where federal jurisdiction is sought to enjoin a state official from engaging in an ongoing violation of state law under the doctrine set forth in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).[23] The second instance is where the state has waived its immunity by filing a claim. IDOR

maintains that neither circumstance applies to the matter at bar.

IDOR does not dispute that the Court has jurisdiction to determine the allowance of its "responsible officer" claim against the Debtor. However, IDOR argues that its filing of a claim against the Debtor for responsible officer liability is separate and distinct from its claim against Chandler, and the filing of the responsible officer claim against the Debtor did not waive IDOR's sovereign immunity so as to allow the Court to redetermine Chandler's liability for the alleged use tax.

The Court holds that sovereign immunity does not bar the Court from redetermining Chandler's tax liability. The fact that IDOR's claim against Chandler and the Debtor are separate and distinct liabilities does not trigger sovereign immunity and the Eleventh Amendment. The matter at bar is a contested claim proceeding—a bankruptcy trustee's objection to a claim filed by a state agency. There is no action brought by the Trustee involuntarily forcing IDOR to unwillingly defend a motion or related adversary proceeding in this Court. IDOR voluntarily consented to the limited subject matter jurisdiction and the equitable powers of this Court and the claim procedures under the Bankruptcy Code when it filed its proof of claim.

The Eleventh Amendment therefore plays no role in this objection to IDOR's late-filed claim. The issue in the cases cited by IDOR is the extent to which Congress is empowered to abrogate state sovereign immunity and allow suits against states. This present proceeding—an objection to a claim—is not the functional equivalent of a private party's suit against an unwilling state. The Court's determination of whether a state tax is owed does not implicate the Eleventh Amendment. *See Scheffel v. New York State Dept. of Taxation and Finance (In re Lehal Realty Assocs.),* 133 B.R. 9, 12 (Bankr.S.D.N.Y.1991) ("In the absence of a demand for a money judgment against a state, the issue of sover-

---

commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.

**23.** This matter does not seek to enjoin a state official from engaging in an ongoing violation of state law. Thus, *Young* is inapplicable to the matter at bar.

eign immunity is not implicated because 11 U.S.C. § 505(a)(1) expressly authorizes this court to 'determine the amount or legality of any tax....'"), *vacated*, 184 B.R. 205 (Bankr.S.D.N.Y.1993). Accordingly, the Court concludes that Eleventh Amendment sovereign immunity is not implicated in this contested claim proceeding because the Trustee makes no demand for a money judgment or other similar relief against IDOR.

■■■■■ Moreover, even if Illinois' sovereign immunity were implicated, the Court finds that IDOR has waived such sovereign immunity defense by filing proofs of claim in the Debtor's bankruptcy case. The majority of cases have held that filing a proof of claim waives the defense of sovereign immunity. *See, e.g., University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1086 (3d Cir.1992); *995 Fifth Ave. Assocs., L.P. v. New York State Dept. of Taxation and Finance (In re 995 Fifth Ave. Assocs., L.P.)*, 963 F.2d 503, 509 (2d Cir.), *cert. denied*, 506 U.S. 947, 113 S.Ct. 395, 121 L.Ed.2d 302 (1992); *Sullivan v. Town & Country Home Nursing Servs., Inc. (In re Town & Country Home Nursing Servs., Inc.)*, 963 F.2d 1146, 1150 (9th Cir.1992); *Anderson v. Federal Deposit Ins. Corp.*, 918 F.2d 1139, 1143–44 (4th Cir.1990). By filing proofs of claim, IDOR has voluntarily submitted itself to the equitable jurisdiction of this Court, and coincidentally, has waived the right to have this matter tried before a jury. *See Langenkamp v. Culp*, 498 U.S. 42, 44–45, 111 S.Ct. 330, 331–32, 112 L.Ed.2d 343 (1990); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58–59, 109 S.Ct. 2782, 2799, 106 L.Ed.2d 26 (1989); *Katchen v. Landy*, 382 U.S. 323, 326, 86 S.Ct. 467, 470–71, 15 L.Ed.2d 391 (1966). These cases lead to the inevitable conclusion that when creditors voluntarily participate in a debtor's bankruptcy case by filing proofs of claim, they thereby consent to have their rights determined as against the bankruptcy estate, and to have the bankruptcy estate's rights determined as against them. If the constitutional right to trial by jury can be waived by the mere filing of the proof of claim, as noted in *Langenkamp, Granfinanciera*, and *Katchen*, so too can IDOR's defense of sovereign immunity. Such a defense is in essence an indirect challenge to the exercise of this Court's in personam jurisdiction. Creditors cannot pick and choose at will. Either they assert sovereign immunity and do not file proofs of claim, but stand suit properly asserting such defenses, as was done in *Leber v. Illinois Dept. of Revenue (In re Leber)*, 134 B.R. 911 (Bankr.N.D.Ill.1991), or as here, where IDOR effectively waived the immunity defenses and subjected itself to the Court's jurisdiction by filing proofs of claim.

IDOR counters that Chandler is not a debtor in bankruptcy and that IDOR has never filed a claim against Chandler for use tax liability in a bankruptcy case involving Chandler. Rather, as the argument goes, the Court would only have jurisdiction to redetermine IDOR's final assessment for use tax against Chandler if Chandler filed a bankruptcy petition, and if IDOR filed a claim in Chandler's bankruptcy case, it would waive its sovereign immunity. Instead, IDOR has filed claims in the Debtor's bankruptcy case, and thus, IDOR has not waived its sovereign immunity under the Eleventh Amendment to allow the Court to make a redetermination of Chandler's tax liability.

■■■■ The Court also rejects this argument. First, as previously noted in the Opinion and Order of November 25, 1992, the Court found that the provisions of § 505(a)(1) allowed the Court to determine Chandler's tax liability. *See Stoecker*, 151 B.R. at 998–99. That point was affirmed by the District Court in its opinion. *See Stoecker*, 179 B.R. at 541. Thus, it is the law of the case and should be followed. Moreover, amended § 106(a)(1) expressly references § 505, showing Congressional intent to legislate abrogation of state sovereign immunity in matters within the scope and reach of § 505. Furthermore, the issue of the Debtor's alleged liability are related and linked to Chandler's alleged liability for non-payment of the assessed use tax. Although a corporate officer may be able to avoid personal liability for an unpaid Illinois use tax properly owed by a corporation by which the officer is claimed responsible, it defies logic to say such officer could be held so liable if in fact and in law the corporation is not liable for the claimed

use tax. IDOR cannot have it both ways and invoke the equitable powers of the Court under the Bankruptcy Code and file a claim to be paid out of the bankruptcy estate assets based on a derivative liability of the Debtor for his alleged willful failure to pay the claimed penalty, without implicating the possible defense that the underlying tax was improperly assessed against Chandler.

## 2. The Sale of the Aircraft Was an "Isolated or Occasional Sale" Exempt From Tax

The District Court specifically instructed this Court that if it "finds that the Debtor wilfully failed to pay the use tax assessed against Chandler, the Court must also make the finding that Chandler owed the assessed tax." *Stoecker*, 179 B.R. at 541. The Trustee argues that the tax upon which IDOR's proof of claim is based was never actually owed by Chandler because the sale of the Aircraft was exempt from the ROTA/use tax as an "isolated or occasional sale" under Ill.Rev.Stat., ch. 120, ¶ 439.2 (1989).[24] The basis for the "occasional sale" exemption is found in Section 3 of the Use Tax Act, Ill.Rev.Stat., ch. 120, ¶ 439.3 (1989).[25] The regulation adopted under the provisions of the Use Tax Act provides further insight:

> Any person who habitually engages in selling tangible personal property for use or consumption, or who, in any manner or at any time, advertises, solicits, offers for sale or holds himself out to the public to be a seller of tangible personal property for use or consumption ... is engaged in the business that is taxed by this Act....

Ill.Admin.Code tit. 86, § 130.115. Based on the statutory provisions and regulation, it is clear that for a person making sales of tangible personal property for use to be exempt from the application of ROTA as an "occasional seller," two conditions must be met. First, the seller must not habitually engage in the sale for use or consumption of the type of tangible property at issue. Second, the seller must not advertise, solicit, offer for sale, or hold himself out to the public as a seller of tangible personal property for use or consumption.

The Trustee argues that Chandler is not liable for the use tax on two theories. First, the Trustee contends that the sale of the Aircraft to Chandler was an "occasional sale" exempt from use tax. Second, the Trustee states that although the title of the Aircraft was previously transferred from Bezwada, then to Opex Aviation, Inc., then to Jack Prewitt & Associates, who transferred it to Prewitt Leasing, who in turn sold the Aircraft to Chandler, for purposes of analyzing the tax consequences, the sale of the Aircraft should be viewed as a sale from Bezwada to Chandler, which the Trustee asserts, is exempt as an "occasional sale."

IDOR, on the other hand, argues that Jack Prewitt & Associates, a predecessor in the chain of title to the Aircraft, was a retailer of aircraft, and hence, the sale was taxable. IDOR maintains that because Jack Prewitt & Associates had been in title to the Aircraft and that title thereto was transferred from Jack Prewitt & Associates to Prewitt Leasing on the same day that Chandler purchased the Aircraft, the sale was not "isolated or occasional" because Jack Prewitt & Associates was a retailer of aircraft.

The evidence adduced on this issue was as follows: Jack Prewitt, president of Prewitt Leasing, testified that Prewitt Leasing, not Jack Prewitt & Associates, bought and owned the Aircraft and resold it to Chandler. (Jack Prewitt Dep. 29–30; Jack Prewitt Dep.

---

**24.** Section 2 of ROTA provides that "a tax is imposed on persons engaged in the business of selling tangible personal property at retail...." Section 1 of ROTA defines the "occasional sale" exemption as follows:

> The isolated or occasional sale of tangible personal property at retail by a person who does not hold himself out as being engaged (or who does not habitually engage) in selling such tangible personal property at retail ... does not constitute engaging in a business of selling such tangible personal property at retail within the meaning of this Act....
> Ill.Rev.Stat., ch. 120, ¶ 440 (1989).

**25.** Section 3 of the Use Tax Act provides:
> If the seller of tangible personal property for use would not be taxable under the Retailers' Occupation Tax Act despite all elements of the sale occurring in Illinois, then the tax imposed by this Act shall not apply to the use of such tangible personal property in this State.
> Ill.Rev.Stat., ch. 120, ¶ 439.3 (1989).

Exhibit No. 9; IDOR's Exhibit No. 7). Prewitt Leasing, a company not engaged in the retail sale of aircraft, actually sold the Aircraft to Chandler. (Jack Prewitt Dep. 7). Jack Prewitt testified that title was inadvertently initially placed in Jack Prewitt & Associates, although it provided none of the funds used to purchase the Aircraft and received no part of the sales commissions. (Jack Prewitt Dep. 41–42, 56–57, 85–86). The error was attributed by Jack Prewitt to his nephew, Raymond Prewitt, who had only recently joined Prewitt Leasing, and to an error by the salesman, who was having medical problems at the time and died shortly after the transaction. (Jack Prewitt Dep. 41). This error was discovered prior to the closing of the Aircraft sale, which occurred on September 30, 1988. (Jack Prewitt Dep. 101–02). Thus, at closing, title was transferred from Jack Prewitt & Associates to Prewitt Leasing to Chandler. (IDOR's Exhibit Nos. 6 and 7).

▮▮▮ The Court finds that IDOR failed to introduce any evidence that Chandler or the Debtor knew that Jack Prewitt & Associates had been in title to the Aircraft, or that title to the Aircraft had been transferred from Jack Prewitt & Associates to Prewitt Leasing on the same day that Chandler purchased the Aircraft. The Court further finds that this error did not change the true character of the transaction—an "occasional sale" from a non-retailer, Prewitt Leasing to Chandler. Although a retailer, Jack Prewitt & Associates, through the above errors, held title to the Aircraft for a period of time, Prewitt Leasing was the party who actually purchase the Aircraft from Opex Aviation, Inc. and sold the Aircraft to Chandler, not Jack Prewitt & Associates.

Anderson offered an alternative analysis of the transaction, namely that it was really a sale from Bezwada to Chandler, with some intermediate title transfers that did not affect the substance of the transaction. (Tr. (Anderson) 128–29; Trustee's Exhibit No. 3). IDOR contends that the intervening transfers cannot be ignored and, even so, there was no evidence that Bezwada was not a retailer. Jack Prewitt described this type of transaction as a "back-to-back" transaction.

(Jack Prewitt Dep. 111–12). Although title passed through intermediate brokers, including Jack Prewitt & Associates, the sale was from Bezwada, a non-retailer, to Chandler. Anderson testified, without contradiction, that Bezwada "was not a dealer." (Tr. (Anderson) 128; Trustee's Exhibit No. 3 at 2).

Thus, the Court finds that the sale from Prewitt Leasing to Chandler qualifies as an "occasional sale" exempt from proper assessment of the Illinois use tax. Jack Prewitt testified that Prewitt Leasing purchased the Aircraft, that Prewitt Leasing leased and then sold the Aircraft to Chandler, and that Prewitt Leasing was in the leasing business, having sold only one aircraft prior to the transaction at issue. (Jack Prewitt Dep. 29–30, 76–77; Trustee's Exhibit No. 4; Jack Prewitt Dep. Exhibit No. 9 at 2, ¶ 4(d)); *see also* (Raymond Prewitt Dep. 11–13). IDOR has offered no contrary evidence.

3. *The Court Will Not Disregard the Separate Legal Entities of Prewitt Leasing and Jack Prewitt & Associates and Thus Find That Prewitt Leasing Was Not an "Occasional" Seller of Aircraft*

IDOR further asserts that Prewitt Leasing and Jack Prewitt & Associates were integrated companies with common ownership and common employees and were acting in concert in selling the Aircraft to Chandler. Therefore, IDOR concludes that Prewitt Leasing acted in concert with Jack Prewitt & Associates, which regularly sold aircraft at retail, and hence, Prewitt Leasing cannot be considered an "occasional" seller with respect to the sale of the Aircraft to Chandler.

▮▮▮ In effect, IDOR argues that the Court should pierce the corporate veils of Prewitt Leasing and Jack Prewitt & Associates, collapse these two corporations into one, and treat the latter as the seller of the Aircraft to Chandler. IDOR's mere allegation that Jack Prewitt & Associates and Prewitt Leasing are one entity does not, however, render Prewitt Leasing and Jack Prewitt & Associates as the same entity. The Court will not disregard the legal fiction of separate corporate entities and pierce a

corporate veil without adequate supporting evidence.

■ The uncontroverted evidence is that Prewitt Leasing, not Jack Prewitt & Associates, acquired the Aircraft from Opex Aviation, Inc.[26] (Jack Prewitt Dep. 29–30). Jack Prewitt testified that Prewitt Leasing had the funds necessary to acquire the Aircraft. *Id.* Jack Prewitt & Associates did not. (Jack Prewitt Dep. 36, 58). Furthermore, the commission on the sale, $150,000, went entirely to Prewitt Leasing. Jack Prewitt & Associates received nothing. (Jack Prewitt Dep. 56–57).

It is true that Jack Prewitt Holding Company, another company associated with Jack Prewitt, filed consolidated tax returns, which included Jack Prewitt & Associates and Prewitt Leasing; that at times, Jack Prewitt & Associates and Prewitt Leasing advertised their services jointly; that occasionally Jack Prewitt & Associates and Prewitt Leasing referred customers to each other; that the two companies had common employees; and that they operated out of the same location. This does not demonstrate, especially in light of the other uncontroverted evidence, that Prewitt Leasing is a retailer of aircraft; nor does it prove that Jack Prewitt & Associates sold the Aircraft to Chandler.

■ Generally, Illinois law treats a corporation as a legal entity separate and distinct from other corporations or individuals with which it may be affiliated. *Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 204, 56 Ill.Dec. 14, 21, 427 N.E.2d 94, 101 (1981); *Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565, 569 (7th Cir.1985). The Illinois Supreme Court has recognized, however, that a corporate entity will be disregarded, and its veil of limited liability pierced, when two requirements are met: (1) there must be such a unity of interest and ownership that the separate personalities of the two corporations no longer exist; and (2) adherence to the fiction of separate corporate existence would sanction a fraud or promote an injustice. *Main Bank*, 86 Ill.2d at 205, 56 Ill.Dec. at 21, 427 N.E.2d at 101; *Van Dorn*,

753 F.2d at 569–70. Factors that the Illinois courts have considered in the determination of whether the first prong of the test has been met are: (1) the failure to maintain adequate corporate records or to comply with corporate formalities; (2) the commingling of funds or assets; (3) undercapitalization; and (4) one corporation treating the assets of another corporation as its own. *Main Bank*, 86 Ill.2d at 205–06, 56 Ill.Dec. at 22, 427 N.E.2d at 102.

■ IDOR has failed to present any evidence to demonstrate that there is a unity of interest and ownership between Jack Prewitt & Associates and Prewitt Leasing such that the separate juridical entities of the two corporations no longer exist. The mere fact that Jack Prewitt is president of both corporations and that they advertise together does not warrant disregarding the corporate entities as separate and distinct from one another. IDOR offered no evidence that the two corporations failed to maintain adequate corporate records or to comply with corporate formalities; that the corporations commingled funds or assets; that either corporation is undercapitalized; or that one corporation treats the assets of the other corporation as its own. Absent a showing of one or more of these factors, the Court will not pierce the corporate veil of Prewitt Leasing and collapse these two distinct corporations into one and find that the sale to Chandler was really made by Jack Prewitt & Associates.

The Court finds that Chandler's purchase of the Aircraft was a purchase from a non-retailer, with some intermediate title transfers that did not affect the substance of the transaction with another non-retailer. The Court finds that Prewitt Leasing owned the Aircraft at and prior to its sale to Chandler. (Jack Prewitt Dep. 29–30; Jack Prewitt Dep. Exhibit No. 9). Prewitt Leasing sold the Aircraft to Chandler. (IDOR's Exhibit No. 7; Jack Prewitt Dep. Exhibit No. 9). The sale of the Aircraft from Prewitt Leasing to Chandler was, therefore, an "occasional sale," exempt from Illinois use tax.

---

**26.** Jack Prewitt stated that Opex Aviation, Inc. only held naked title—it did not own the Aircraft. (Jack Prewitt Dep. 115–16). Prewitt speculated that Opex Aviation, Inc. held title because the Aircraft originated in Australia and needed to be titled to a United States entity prior to sale. *Id.*

## C. Was the Debtor a Responsible Officer Who Willfully Failed to Pay the Use Tax Assessed Against Chandler? [27]

The District Court held that this Court erred in finding that IDOR failed to meet its burden regarding whether the Debtor willfully failed to pay the tax assessed against Chandler. *Stoecker,* 179 B.R. at 541–44. The District Court held that IDOR's determination of a penalty due against a responsible individual, as evidenced by the NPL, establishes a prima facie case regarding all the statutory elements required for the imposition of such a penalty. *Id.* 544. The District Court noted that a taxpayer has better access to his or her records and witnesses to rebut the claim of willfulness. *Id.* Thus, the burden shifts to the Trustee to rebut the prima facie weight accorded the NPL. *Id.*[28]

### 1. The Law of the Case Doctrine Prevents the Court From Not Considering the NPL as Prima Facie Evidence

 The law of the case doctrine requires a lower court judge to comply with the rulings made by higher courts in the same case. *See State of Arizona v. State of California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *Cole Energy Dev. Co. v. Ingersoll–Rand Co.,* 8 F.3d 607, 609 (7th Cir.1993) (citations omitted). "[E]xplicit rulings on issues that were before the higher court and explicit directives by that court to the lower court concerning proceedings on remand are not dicta." *Id.* (citations omitted). The law of the case will not be enforced, however, where it is clearly erroneous or where doing so would produce an injustice. *Redfield v. Continental Casualty Corp.,* 818 F.2d 596, 605 (7th Cir.1987) (cita-

tions omitted). Previously decided determinations are not applied if there are reasons rendering the doctrine inapplicable, such as: (1) substantial new evidence introduced after the first review; (2) a decision of the United States Supreme Court after the first review; or (3) a conviction on the part of the second reviewing court that the decision of the first was clearly erroneous. *Key v. Sullivan,* 925 F.2d 1056, 1060 (7th Cir.1991) (citation omitted); *Parts and Elec. Motors, Inc. v. Sterling Elec. Inc.,* 866 F.2d 228, 231 (7th Cir.1988), *cert. denied,* 493 U.S. 847, 110 S.Ct. 141, 107 L.Ed.2d 100 (1989).

 In remanding the case, the District Court held that "[t]he NPL *shall* be considered prima facie proof of the Debtor's willfulness which the Trustee will have the burden to rebut.... After hearing all the evidence offered by the parties, the Bankruptcy Court should determine whether the Trustee successfully proved that the Debtor's inaction was not willful." *Stoecker,* 179 B.R. at 544 (emphasis supplied). The District Court found that the NPL constituted prima facie proof of all elements of responsible officer liability including the element of willfulness, and that the burden was on the Trustee to establish that the Debtor's failure to pay the tax was not willful.

The Court finds and concludes that it is bound to follow the District Court's directive. There has been no substantial new evidence introduced to this Court after the District Court's decision; no decision of the United States Supreme Court has been rendered that deals with the issues at bar; and this Court does not possess a conviction that the decision of the District Court was clearly erroneous.[29] The District Court clearly held

---

27. Notwithstanding the fact that the Court has determined that Chandler did not properly owe the assessed use tax, the Court nevertheless will address the issue of whether the Debtor's failure to pay the tax was willful. In the interest of completing the record and because the District Court specifically remanded this issue, the Court will decide same.

28. As noted above, the NPL was not issued in violation of the automatic stay and is not void. The Trustee's argument that the NPL cannot constitute prima facie evidence in this case is therefore without merit.

29. While this Court respectfully disagrees with some of the District Court's conclusions, this Court is not willing to make a determination that same were clearly erroneous, notwithstanding this Court's opinion that its findings and conclusions contained in its Opinion and Order dated November 25, 1992 were correct and represent the better view of the matter. *See Stoecker,* 151 B.R. 989. Rather, the Court acknowledges the hierarchy in the federal judiciary from which flows the doctrines of law of the case and stare decisis—two doctrines which the Court believes it must and should follow.

that the NPL shall be considered prima facie evidence of the Debtor's willfulness. *Stoecker,* 179 B.R. at 544. Accordingly, the Court will discuss whether the Trustee introduced evidence sufficient to adequately demonstrate that the Debtor's failure to pay IDOR pursuant to the NPL was not willful, thereby successfully rebutting the presumption of willfulness.

### 2. Applicable Statutes and Case Law Regarding Responsible Officer Liability

IDOR argues that the evidence clearly shows that the Debtor's failure to pay the use tax was, at the very least, a reckless disregard for a known risk of violation and therefore was willful. The Trustee, on the other hand, contends that the evidence, namely the opinion letter by Anderson, indicates that the transaction was an occasional sale and thus not taxable. The Trustee further submits that the representations of the seller demonstrate that the Aircraft purchase was properly claimed exempt from the use tax. The Trustee further argues that even if Anderson's opinion letter and the representations made to Chandler from the seller were incorrect, the Debtor's reliance on same negates any inference of willfulness on his part.

Section 13½ of the Retailers' Occupation Tax Act ("ROTA") provides that a responsible individual may be liable for taxes under certain circumstances when a corporate taxpayer fails to pay the taxes.[30]

In *Branson v. Department of Revenue,* 168 Ill.2d 247, 213 Ill.Dec. 615, 659 N.E.2d 961 (1995), decided after the Court's Opinion and Order dated November 25, 1992, the Illinois Supreme Court defined the willful failure to pay taxes for purposes of Section 13½ of ROTA as involving "intentional, knowing and voluntary acts" or, alternatively, "reckless disregard for obvious or known risks" which includes "gross negligence involving a known risk of violation." 168 Ill.2d

at 255, 213 Ill.Dec. at 620, 659 N.E.2d at 965; *see also Department of Revenue v. Heartland Invs., Inc.,* 106 Ill.2d 19, 29, 86 Ill.Dec. 912, 917, 476 N.E.2d 413, 418 (1985); *Department of Revenue v. Joseph Bublick & Sons, Inc.,* 68 Ill.2d 568, 577, 12 Ill.Dec. 265, 269, 369 N.E.2d 1279, 1283 (1977) ("a voluntary, conscious and intentional failure satisfies the requirements of 'wilfully fail' "). Willfulness is determined by whether (1) the Debtor knew the tax was due and (2) nonpayment of the tax resulted from the voluntary, conscious, and intentional failure to pay by the Debtor. *See Department of Revenue v. Corrosion Systems, Inc.,* 185 Ill.App.3d 580, 583–85, 133 Ill.Dec. 647, 650, 541 N.E.2d 858, 861 (4th Dist.1989); *Department of Revenue v. Marion Sopko, Inc.,* 84 Ill.App.3d 953, 955–56, 40 Ill.Dec. 487, 488, 406 N.E.2d 188, 189 (2d Dist.1980). *See also People ex rel. Dept. of Revenue v. National Liquors Empire, Inc.,* 157 Ill.App.3d 434, 439, 109 Ill.Dec. 627, 631, 510 N.E.2d 495, 499 (4th Dist.1987). ("A person must have knowledge to voluntarily, consciously and intentionally fail to file and pay the correct amount of taxes due.").

To establish that the Debtor was a responsible party, the requisite inquiry under ROTA is whether the Debtor had "control, supervision or responsibility for filing returns and making payment of the amount of tax herein imposed...." Ill.Rev.Stat., ch. 120, ¶ 452½ (1991).

### 3. The Evidence Did Not Show That the Debtor Had Control, Supervision, or Responsibility for Filing Returns and Making Payment of the Tax Allegedly Owed By Chandler

The Trustee argues that IDOR offered no evidence that the Debtor was in control, or had the supervision or responsibility over Chandler's payment of taxes within the meaning of ROTA. The Trustee contends that all of the evidence demonstrated that

---

**30.** Section 13½ of ROTA provides in relevant part:

> Any officer or employee of any corporation subject to the provisions of this Act who has the control, supervision or responsibility of filing returns and making payment of the amount of tax here imposed ... and who willfully fails to file such return or to make any such pay-

ment to [IDOR] or who willfully attempts in any other manner to evade or defeat the tax shall be personally liable for a penalty equal to the total amount of tax unpaid by the corporation, including interest and penalties thereon....

Ill.Rev.Stat., ch. 120, ¶ 452½ (1991).

Pluhar, not the Debtor, was in charge of the day to day operations and financial responsibilities of Chandler. Thereby, the Trustee maintains that he has submitted substantive evidence rebutting the prima facie effect of the NPL.

The Trustee introduced evidence that Pluhar was the Chandler officer responsible for the payment of Chandler's bills and taxes. Anderson, counsel for Chandler, testified that Pluhar functioned as the Debtor's chief financial officer. (Tr. (Anderson) 131). Anderson discussed with Pluhar the "potential tax ramifications of the sale [of the Aircraft]." (Tr. (Anderson) 134). Anderson also testified that in addition to Pluhar, he dealt with George Weiler on behalf of Chandler, not with the Debtor. (Tr. (Anderson) 125). Pluhar signed the Aircraft Purchase Agreement (Jack Prewitt Dep. Exhibit No. 9 at 5), and was the person from Chandler with the most involvement in the purchase. (Jack Prewitt Dep. Exhibit No. 14). There is no direct evidence, however, linking the Debtor to Chandler's day to day operations and the payment of its bills and taxes in the course of its business.

IDOR offered evidence that the Debtor was the president and a director of Chandler. (IDOR's Exhibit No. 19). Based on this evidence, IDOR summarily concludes that the Debtor was the responsible party. Further, IDOR points to the Aircraft Lease/Purchase Agreement, which was signed by the Debtor. (Jack Prewitt Dep. Exhibit No. 3 at 10).

■ The Seventh Circuit in *Monday v. United States*, 421 F.2d 1210 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970) has held, however, that holding corporate office, alone, is insufficient to establish responsible party liability.

> Corporate office does not, *per se*, impose the duty to collect, account for and pay over the withheld taxes. On the other hand, an officer may have such a duty even though he is not the disbursing officer.... Liability attaches to those with power and

responsibility within the corporate structure for seeing that the taxes withheld from various sources are remitted to the Government.... This duty is generally found in high corporate officials charged with general control over corporate business affairs who participate in decisions concerning payment of creditors and disbursal of funds.

*Id.* at 1214–15 (determination of responsible party liability under Internal Revenue Code) (citations omitted).[31] Other courts have likewise held that the authority of a corporate officer alone is insufficient to establish responsible party liability. *See In re Premo*, 116 B.R. 515, 525 (Bankr.E.D.Mich.1990) (responsible party liability under Internal Revenue Code).

The Seventh Circuit addressed "responsible person" liability within the meaning of Section 6672 of the Internal Revenue Code, a provision somewhat analogous to Section 13½ of ROTA, in *United States Internal Revenue Service v. Charlton*, 2 F.3d 237 (7th Cir. 1993). In order to determine whether a person is a "responsible person" within the meaning of Section 6672, the Seventh Circuit opined:

> Whether such a duty exists depends on whether the taxpayer has "significant control or authority over an enterprise's finances or general decision-making." Relevant factors include the holding of an entrepreneurial stake in a company, the holding of corporate office, the authority to disburse funds on behalf of the company, the ability to take out loans on behalf of the company and the ability to hire and fire employees. The true objective of this inquiry, and the sine qua non of liability under section 6672, is a determination that the taxpayer had the authority to allocate funds to pay the company's other debts in preference to its debt to the IRS.

*Id.* at 240 (citations omitted). *See also In re Tripplett*, 115 B.R. 955, 963–64 (Bankr. N.D.Ill.1990). In *Charlton*, the court found

---

**31.** Illinois case law recognizes that reference to analogous federal case law interpreting the federal responsible officer statute is appropriate in interpreting the responsible officer provisions of ROTA. *See Branson*, 168 Ill.2d at 261–62, 213 Ill.Dec. at 622, 659 N.E.2d at 968; *Heartland*, 106 Ill.2d at 29–30, 86 Ill.Dec. at 916–17, 476 N.E.2d at 417–18.

evidence that the defendant held a substantial entrepreneurial stake in the companies; he was a member of the boards of directors of all of the corporations, and secretary of several of them. 2 F.3d at 240. Further, the defendant had the authority to borrow money on behalf of the corporations and to disburse the companies' funds. *Id.* The court specifically rejected the defendant's argument that while he had the titular authority to disburse the corporations' funds, he had delegated that responsibility to others. *Id.* The court noted that delegation of disbursal authority does not relieve the delegator of liability. *Id.* (citation omitted). The court stated that "a corporate president who relies on others for routine calculation and payment of taxes *may* also be held liable." *Id.* (citation omitted and emphasis supplied).

▆▆▆ The Court finds that IDOR failed to introduce sufficient evidence to adequately prove that the Debtor had actual control, supervision, or responsibility for making payment of the tax allegedly owed by Chandler. The mere fact that the Debtor was the president of Chandler did not ipso facto impose upon him the duty of paying Chandler's taxes or being the responsible officer for paying Chandler's various bills. The limited evidence adduced showed that Pluhar, not the Debtor, was responsible for and in control of Chandler's finances. IDOR failed to introduce any evidence that the Debtor in fact exercised any authority or controlled the payment of Chandler's taxes. The Court is not willing without more, however, to equate potential authority with de facto or de jure duty. The logical conclusion of IDOR's argument seems to be that the Debtor, by virtue of his status as president, director, and shareholder of Chandler, was in control of Chandler's payment of expenses and taxes. The Court is unwilling to functionally relegate the Debtor to becoming a personal guarantor of the claimed unpaid taxes assessed against Chandler without any evidence to show that the Debtor was actually in control of Chandler's financial affairs.

As the Court previously stated, the Court can reasonably infer that the Debtor, as such officer and director, had ultimate general control of Chandler's affairs. *See Stoecker,*

151 B.R. at 1000. Anderson's testimony that he dealt primarily with Pluhar and Weiler while representing Chandler (Tr. (Anderson) 125, 131, and 134) does not establish that the Debtor in fact exercised any authority or control to determine whether taxes should be paid. As president of Chandler, the Debtor certainly held an entrepreneurial stake in Chandler, and he may have possessed the potential authority to disburse funds on behalf of the company, and may have had the ability to take out loans on behalf of Chandler, or the ability to hire and fire employees. However, there was no testimony that the Debtor exercised any authority or power to determine whether taxes should be paid. What is lacking here is any evidence to show any actual exercise of control by the Debtor as summarily concluded by IDOR. Mere status as a corporate officer is insufficient to subject a debtor to the responsible person liability. There must be some evidence of actual control, supervision, or responsibility.

The Court finds that IDOR's NPL, together with the Debtor's status as corporate officer, director, and shareholder does not establish that the Debtor exercised control over Chandler's finances and payment of its taxes. Rather, the evidence leads the Court to conclude that he delegated such authority and power to Pluhar. Because there is no evidence before the Court to show that the Debtor had control, supervision, or responsibility for the payment of Chandler's taxes, there can be no finding that the Debtor took any action that can be construed as voluntary, conscious, and intentional or in reckless disregard with respect to any failure to pay assessed taxes.

### 4. *The Debtor's Failure to Pay the Tax Was Not Shown To Be Voluntary, Conscious, and Intentional*

Even if the Debtor was in control, or had the supervision or responsibility for filing tax returns and making payment of taxes owed by Chandler, the Court will next address whether the Debtor's actions in failing to pay the assessed use tax were voluntary, conscious, and intentional. The evidence adduced demonstrated the following:

Anderson's opinion letter was supported by the "Certificate Re Occasional Seller Exemption from Illinois Sales and Use Tax" signed by Prewitt Leasing's vice president on September 30, 1988. (Trustee's Exhibit No. 4; Tr. (Anderson) 132). Anderson never issued the opinion letter to Chandler or any of its officers. Nevertheless, Anderson gave Pluhar a copy of the legal opinion letter. (Tr. (Anderson) 130–31). The accuracy of the representations contained in the Certificate and the Aircraft Purchase Agreement were confirmed by the president of Prewitt Leasing, Jack Prewitt. (Jack Prewitt Dep. 3–4, 76–77; Prewitt Dep. Exhibit No. 9 at 2, ¶ 4(d)) ("Prewitt [Leasing] is not a manufacturer of aircraft or a dealer or distributor of aircraft...."). Anderson discussed the tax implications of the Aircraft purchase with Pluhar. Anderson testified that Pluhar stated: "This transaction is really an occasional sale. You're buying this aircraft from Bezwada, but with all of these interbreeding transfers, you've muddied the waters here; and if, you know, that because of all these transfers, [IDOR] could construct an argument that the tax is due." (Tr. (Anderson) 134). Anderson replied: "I don't think a tax is due but you've got to understand that because of these transfers it's not as clear cut as it was when—if you just gave the money to Bezwada and took title to the [A]ircraft." (Tr. (Anderson) 135).

IDOR argues that the Trustee provided no evidence that the Debtor actually relied on Anderson's letter to NEMLC in not paying the tax. IDOR contends that the Trustee is asking the Court to infer reliance. IDOR maintains that such an inference is not proper for two reasons: (1) other evidence suggests that Chandler and the Debtor attempted to avoid the issue of whether tax was due on the purchase of the Aircraft by failing to file a use tax return, even one that claimed the purchase to be exempt, and Chandler did not register the Aircraft with the Illinois Department of Transportation Division of Aeronautics as required by Ill.Rev.Stat., ch. 15½, ¶ 22.42 (1989); and (2) Anderson did not issue a similar legal opinion to Chandler or the Debtor, and Anderson never sought a private letter ruling from IDOR on the issue of taxability of the sale. Thus, IDOR con-

tends that to infer reliance by the Debtor on Anderson's letter in these circumstances would be improper.

The evidence suggests, however, that Pluhar, as corporate financial officer of Chandler, was responsible for the payment of taxes and other debts of the corporation. Thus, to the extent that the Debtor was in control of this function at all, he was acting through Pluhar, as his agent.

In Illinois, an agency is a consensual fiduciary relationship between two legal entities whereby the principal has the right to control the conduct of the agent and the agent has the power to effect the legal relations of the principal. *Greenfield Direct Response, Inc. v. ADCO List Management (In re Greenfield Direct Response, Inc.)*, 171 B.R. 848, 855 (Bankr.N.D.Ill.1994) (citations omitted). The key consideration in determining whether an agency relationship exists is whether the principal had the right to control the activities of the agent. *Oberlin v. Marlin American Corp.*, 596 F.2d 1322, 1326 (7th Cir.1979). Although existence of an agency relationship is a question of fact, it may be inferred from facts of a particular case. *Greenfield*, 171 B.R. at 855 (citations omitted). An agency relationship can be inferred from circumstantial evidence, including the situation occupied by the parties, their acts, and other relevant circumstances. *City of Evanston v. Piotrowicz*, 20 Ill.2d 512, 518, 170 N.E.2d 569, 573 (1960). To bind the principal, the agent must have either actual authority, apparent authority, or the principal must ratify the agent's actions. *Anetsberger v. Metropolitan Life Ins. Co.*, 14 F.3d 1226, 1234 (7th Cir.1994).

To the extent, if any, that the Debtor was in control of paying any taxes, the Court will infer an agency relationship between the Debtor and Pluhar. As an agent of the Debtor, Pluhar had the authority to bind the Debtor.

Furthermore, the Court finds that Pluhar, as the agent of the Debtor, reasonably relied on the legal opinion of Anderson supported by the Certificate from the seller. Reasonable reliance by a corporate officer on advice of his attorney or accountant in not

paying a tax can obviate a finding of willfulness. *See Gray Line Co. v. Granquist*, 237 F.2d 390, 395 (9th Cir.1956) (refusing to find officer acted willfully where he relied on advice of competent counsel and tax collector that no tax was due), *cert. denied*, 353 U.S. 911, 77 S.Ct. 667, 1 L.Ed.2d 664 (1957); *Corrosion Systems*, 185 Ill.App.3d at 583–84, 133 Ill.Dec. at 650, 541 N.E.2d at 861 (holding that officer's reliance on accountant negated a finding that he acted consciously, voluntarily, intentionally, knowingly, or recklessly in his failure to pay tax). IDOR argues that there was no evidence submitted that the Debtor relied on Anderson's opinion letter, which was issued to NEMLC. The mere fact that the opinion letter was addressed to NEMLC, Chandler's lender, does not ipso facto mean that the Debtor would not have been able to rely upon the letter. After all, Anderson was counsel to Chandler, not NEMLC. (Trustee's Exhibit No. 3; Tr. (Anderson) 124–25).

■ The evidence submitted demonstrated that Pluhar, the individual officer responsible for Chandler's finances, (Tr. (Anderson) 131), did review Anderson's letter and had a discussion with Anderson regarding the potential taxability of the Aircraft purchase. The Court finds that Pluhar, as the officer responsible for Chandler's finances, reasonably relied on this advice. Furthermore, because Pluhar was an agent of the Debtor, to the extent that the Debtor was in control at all, this reasonable reliance is imputed to the Debtor as principal.

Accordingly, the Court finds that the Debtor, through his agent Pluhar, relied on the opinion letter in deciding not to pay the use tax assessed against Chandler. Hence, the Debtor's reliance on this opinion letter negates a finding that he acted consciously, voluntarily, intentionally, knowingly, or recklessly in his failure to pay the assessed tax.

Additionally, the Court finds that Anderson's failure to seek a private letter ruling from IDOR that the sale of the Aircraft was not taxable does not prevent the Court from finding that the Debtor, through Pluhar, reasonably relied on Anderson's legal opinion letter. Even if the legal opinion and representations by the seller were incorrect, same negate any presumption that the Debtor acted willfully in failing to pay the tax. The Court therefore holds that the totality of the evidence does not demonstrate that the Debtor's failure to pay the tax showed a "gross negligence involving a known risk of violation" and was therefore willful.

**5. The Court Will Not Draw Any Inferences From the Debtor's Invocation of the Fifth Amendment Privilege**

There is no direct evidence that the Debtor had control in this situation or that he relied on Anderson's opinion letter because in response to questioning in this matter, the Debtor asserted his Fifth Amendment privilege. IDOR argues that the Court should construe the Debtor's silence against him in making a determination of whether the Debtor's failure to pay the tax was willful. Specifically, IDOR maintains that it is properly entitled to rely on the negative inference arising from the Debtor's assertion of the Fifth Amendment privilege to the question of whether he actually relied on advice of counsel when he failed to pay the use tax.[32]

The Supreme Court in *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) stated that "the Fifth Amendment does not forbid inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not pre-

---

**32.** IDOR cites several cases in support of this proposition. *See Cerro Gordo Charity v. Fireman's Fund American Life Ins. Co.*, 819 F.2d 1471 (8th Cir.1987); *RAD Services, Inc. v. Aetna Casualty & Surety Co.*, 808 F.2d 271 (3d Cir. 1986); *Brink's Inc. v. City of New York*, 717 F.2d 700 (2d Cir.1983). None of these cases are controlling or directly on point. The matter at bar does not involve a situation in which one of the litigants asserts a Fifth Amendment privilege relating to matters within the scope of his prior employment or board responsibilities. The Debtor is not a party to the instant contested claim. IDOR is the party claimant and the Trustee is the party objector. Moreover, this is not a case in which a conspirator has asserted his Fifth Amendment privilege in a case against his co-conspirator. *See United States v. District Council of New York and Vicinity of United Bhd. of Carpenters and Joiners of America*, 832 F.Supp. 644 (S.D.N.Y.1993); *Aetna Casualty & Surety Co. v. Rodco Autobody*, 138 F.R.D. 328 (D.Mass.1991).

clude the inference where the privilege is claimed by a party to a Civil cause.'" *Id.* at 318, 96 S.Ct. at 1558 (citation omitted). In *Baxter*, an inmate of a Rhode Island prison was charged in a disciplinary proceeding with inciting a disturbance of prison operations. At a hearing in which he was told that he had the right to remain silent, but that if he did so, his silence would be used against him, the prisoner remained silent when faced with incriminating evidence. *Id.* at 312, 96 S.Ct. at 1555. The prison board placed the prisoner in segregation for thirty days and downgraded his institutional status. *Id.* at 313, 317, 96 S.Ct. at 1955–56, 1557. In *Lefkowitz v. Cunningham,* 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977), the Supreme Court characterized the *Baxter* holding in this way:

> Baxter did no more than permit an inference to be drawn in a civil case from a party's refusal to testify. Respondent's silence in *Baxter* was only one of a number of factors to be considered by the finder of fact in assessing a penalty, and was given no more probative value than the facts of the case warranted; here, refusal to waive the Fifth Amendment privilege leads automatically and without more to imposition of sanctions.

*Id.* at 808 n. 5, 97 S.Ct. at 2137 n. 5.

The rule that adverse inferences may be drawn from Fifth Amendment silence in civil proceedings has been recognized by the Seventh Circuit. *See, e.g., Daniels v. Pipefitters' Ass'n Local Union No. 597,* 983 F.2d 800, 801–02 (7th Cir.1993); *National Acceptance Co. of America v. Bathalter,* 705 F.2d 924, 929–30 (7th Cir.1983). The inference against a witness that may be drawn from the invocation of the Fifth Amendment in a civil action is permissive. *Daniels,* 983 F.2d at 802. The language in *Baxter* indicates that the inference is not required; it may be drawn, but it does not necessarily need to be drawn. *Daniels,* 983 F.2d at 802. Thus, although the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them, an analysis of that evidence is nonetheless required.

The adverse inference that may be drawn when a party asserts the Fifth Amendment privilege is not a substitute for proof and cannot fill an evidentiary void. *See United States v. Rylander,* 460 U.S. 752, 758, 103 S.Ct. 1548, 1553, 75 L.Ed.2d 521 (1983). "Silence is a relevant factor to be considered in light of the proffered evidence, but the direct inference of guilt from silence is forbidden." *LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 390 (7th Cir.1995); *see also Bathalter,* 705 F.2d at 927–28 (failure to answer the allegations of a civil complaint based on the assertion of Fifth Amendment privilege cannot be construed as an admission).

The Court will not construe the Debtor's silence or invocation of the Fifth Amendment as an admission of his willfulness not to pay the assessed tax. To do so would constitute a substitute for proof and fill an evidentiary void. The Debtor is not a party to this contested claim and has never been involved in this matter. Rather, in objecting to IDOR's claim, the Trustee acts as the statutory representative of the Debtor's creditors. *Baxter* does not mandate an adverse inference against the Trustee in this claim objection proceeding wherein the Debtor has invoked the Fifth Amendment privilege. The Court declines to draw any inference whatsoever in this matter from the Debtor's timely and proper invocation of his Fifth Amendment privilege. The Debtor is currently under indictment for federal bank fraud and other charges, and is awaiting trial in the District Court. Some of the charges relate to his involvement with Chandler. Hence, the Debtor's invocation of the Fifth Amendment is both understandable and proper.

To draw an adverse inference against the Trustee based upon the Debtor's invocation of the Fifth Amendment would unfairly prejudice the Trustee as well as the creditors of the Debtor's estate by punishing them for the Debtor's attempt to shield himself from criminal liability. In *Libutti v. United States,* 894 F.Supp. 589 (N.D.N.Y.1995), the court refused to draw an adverse inference in a tax suit against a litigant because of her

father's assertion of the Fifth Amendment privilege. The court reasoned that:

> The government has not provided any cases in which a non-party witness' invocation of his Fifth Amendment privilege has resulted in drawing an adverse interest [sic] against a party where the non-party witness was not in some way a former member or employee of the party at issue. Additionally, the Second Circuit has held in a case where a non-party, who did not have a former member or employee relationship with the party at issue, invoked his Fifth Amendment privilege that "no adverse interest [sic] against appellees could have been drawn by his refusal to testify." *Brenner v. World Boxing Council,* 675 F.2d 445, 454 n. 7 (2d Cir.1982). Thus, the court in this case, refuses to draw an adverse inference against Edith LiButti because of Robert LiButti's assertion of his Fifth Amendment privileges.

*Id.* at 597.[33] The Court will not undercut the limited protection provided by the Fifth Amendment and effectively impose a civil penalty by making an adverse finding against the Debtor's bankruptcy Trustee or the estate for the Debtor's silence.

The Debtor has not cooperated with either the Trustee or IDOR in this matter. It is undisputed that neither side has an unfair advantage over the other or has suffered any remediable disadvantage because the Debtor has refused to cooperate with either party. The Debtor's failure to cooperate has not prevented effective cross-examination because neither party to this contested claim has had an opportunity to directly examine the Debtor. The Court, as the fact finder, is fully aware of the Debtor's invocation of the Fifth Amendment privilege. The Court has chosen, in its discretion, not to draw any inferences either against or for the Trustee or IDOR because of the Debtor's invocation of this privilege. The Court is not required to draw any inferences from the Debtor's invocation of the Fifth Amendment privilege.

*See, e.g., Old Security Life Ins. Co. v. Continental Illinois Nat. Bank & Trust Co. of Chicago,* 740 F.2d 1384, 1398 (7th Cir.1984).

### 6. The Use Tax Allegedly Owed By Chandler Arose on September 30, 1988

Additionally, IDOR argues that the Debtor could not have relied on Anderson's opinion letter, which is dated September 30, 1988, because the alleged use tax arose on June 7, 1988, the date Chandler entered into the Aircraft Lease/Purchase Agreement.

IDOR correctly points out that the District Court, in remanding this matter, stated that the Court had discretion to reopen the proofs so that both parties could introduce additional evidence. *See Stoecker,* 179 B.R. at 544. IDOR states that it is not estopped from arguing that the taxable sale took place on June 7, 1988, in light of the new evidence introduced. IDOR contends that evidence was presented to the Court on April 29, 1996 in the form of depositions and exhibits that indicate the sale took place on June 7, 1988.

IDOR posits that this issue is important to the determination of this matter for two reasons. First, if Prewitt Leasing (assuming Prewitt Leasing was the party purchasing the Aircraft from Opex Aviation, Inc./Bezwada), purchased the Aircraft with the intention of leasing it to Chandler, Prewitt Leasing and not Chandler would be deemed the "user" for purposes of the Use Tax Act and Prewitt Leasing would have been the party responsible for the tax. If, however, Prewitt Leasing purchased the Aircraft for the purpose of resale, and the Aircraft Lease/Purchase Agreement is found to be a conditional sale, Chandler would be liable for the use tax at the time it entered into the Aircraft Lease/Purchase Agreement and took delivery of the Aircraft on June 7, 1988, unless the sale is deemed an "occasional" sale. The second reason the date issue is important pertains to the Debtor's willfulness because

---

33. The Trustee argues that the only evidence offered by IDOR of the Debtor's willfulness is the allegedly invalid NPL (invalid because it was allegedly issued in violation of the automatic stay). However, as already noted above, the NPL did not violate the automatic stay, and therefore is not void. The District Court has already found the NPL constitutes prima facie proof of the Debtor's willfulness. Furthermore, IDOR has submitted other evidence of the Debtor's willfulness.

IDOR asserts that the issue of willfulness is determined at the time the tax is incurred.

The evidence in the record shows that Anderson formulated his opinion before September 30, 1988, and discussed the tax aspects of the transaction with counsel for NEMLC and with Pluhar prior to September 30, 1988. (Tr. (Anderson) 125–26, 132, and 134). Moreover, the Court finds that the sale of the Aircraft to Chandler took place on September 30, 1988, not June 7, 1988. Several facts in evidence support this finding. First, the Aircraft Purchase Agreement between Prewitt Leasing and Chandler is dated September 30, 1988. (Jack Prewitt Dep. Exhibit No. 9). That agreement is fully integrated and provides:

> (b) This Agreement constitutes the entire understanding of the parties relating to the subject matter thereof, and supercedes all prior representations and agreements, written or oral, relating to the subject matter hereof.

*Id.* at 4. Second, the NPL upon which IDOR relies asserts that the Aircraft was purchased in September 1988. (IDOR's Exhibit No. 1). In addition, the NTL sent to Chandler also references September 1988 as the date Chandler purchased the Aircraft. (IDOR's Exhibit No. 10 at 2 and 5). Furthermore, the Aircraft bill of sale also shows that the Aircraft was purchased by Chandler on September 30, 1988. (IDOR's Exhibit No. 7). Finally, IDOR's proof of claim indicates a sale date of September 1988. (IDOR's Exhibit No. 17). Both this Court and the District Court found, based on the evidence submitted by IDOR, that the Aircraft was sold to Chandler on September 30, 1988. *See Stoecker,* 151 B.R. at 992; *Stoecker,* 179 B.R. at 534.

**7. The Aircraft Lease/Purchase Agreement Between Chandler & Prewitt Leasing Was Not a Disguised Conditional Sale**

IDOR's argument that the Aircraft Lease/Purchase Agreement was really entered into between Prewitt Leasing and Chandler on June 7, 1988 when Chandler took delivery of the Aircraft on that same date, and the Lease/Purchase Agreement with option to buy was really a disguised conditional sale or security agreement and that it therefore gave rise to use tax liability, is likewise without merit. At his deposition, Jack Prewitt testified that the Aircraft was purchased for the purpose of reselling it to Chandler. (Jack Prewitt Dep. 24). Further, Jack Prewitt authenticated the Aircraft Lease/Purchase Agreement as the operative agreement pursuant to which Chandler took delivery of the Aircraft. (Jack Prewitt Dep. 51–52). Additionally, he testified that when Chandler "purchased" the Aircraft on September 30, 1988, it was exercising its buy out option pursuant to the Aircraft Lease/Purchase Agreement. (Jack Prewitt Dep. 66–67).

IDOR argues that the Aircraft Lease/Purchase Agreement required Chandler to pay a security deposit of $2,455,016 of which $2,405,016 could be applied to the buy out option price of $12,405,016. (Jack Prewitt Dep. Exhibit No. 3). The amount of additional funds needed by Chandler to exercise the buy out option was $10 million. According to IDOR, this $10 million was much less than the appraised value of the Aircraft which was $12.5–12.7 million. IDOR concludes that the amount required to exercise the buy out option under the lease was substantially less than the fair market value of the property, thus, the lease should be deemed a conditional sale and not a true lease with an option to buy later exercised in September 1988 by Chandler.

■ To determine whether an agreement that purports to be a lease is a true lease or a security agreement, the Court must look to state law. *Powers v. Royce Inc. (In re Powers),* 983 F.2d 88, 90 (7th Cir.1993) ("Ordinarily the existence, nature and extent to a security interest in property is governed by state law."). Arguably, the Federal Aviation Act, 49 U.S.C. § 40101 *et seq.* ("FAA"), applies. However, it is not necessary for this decision to determine whether the FAA, which creates a federal recording scheme, preempts the definition of a conditional sales contract.[34]

---

34. FAA creates, *inter alia,* a national recording scheme for air commerce. Most courts have

In FAA § 40102, a "conveyance" is "an instrument, including a conditional sales contract, affecting title to, or an interest in, property." 49 U.S.C. § 40102(19). The FAA defines a conditional sales contract as:

(A) for the sale of an aircraft, aircraft engine, propeller, appliance, or spare part, under which the buyer takes possession of the property but title to the property vests in the buyer at a later time on—

(i) paying any part of the purchase price;

(ii) performing another condition; or

(iii) the happening of a contingency; or

(B) to bail or lease an aircraft, aircraft engine, propeller, appliance, or spare part, under which the bailee or lessee—

(i) agrees to pay an amount substantially equal to the value of the property; and

(ii) is to become, or has the option of becoming, the owner of the property on complying with the contract.

49 U.S.C. § 40102(18).

Alternatively, under Illinois state law, to determine whether an agreement that purports to be a lease is a true lease or a security agreement, the Court must look to the Illinois Commercial Code, § 1–201(37), which provides in relevant part:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation.... Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee; and

(a) the original term of the lease is equal to or greater than the remaining economic life of the goods;

(b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or

(d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

810 ILCS 5/1–201(37). Section 1–207(37) also sets forth criterion which, found alone, would not be sufficient proof of a security agreement:

A transaction does not create a security interest merely because it provides that:

(a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair marker value of the goods at the time the lease is entered into;

(b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods;

(c) the lessee has an option to renew the lease or to become the owner of the goods;

(d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable

---

held that although the FAA operates to determine whether a valid recording has occurred, in most other aspects of secured transactions it does not preempt state law. *See, e.g., Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.),* 850 F.2d 1275, 1278 (8th Cir.1988) (holding that FAA does not preempt state law when determining date of perfection); *Gary Aircraft Corp. v. General Dynamics Corp. (In re Gary Aircraft Corp.),* 681 F.2d 365, 372 (5th Cir.1982) (holds that FAA does not displace state law assignment of priorities to interests in aircraft), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3110, 77 L.Ed.2d 1366 (1983); *Danning v. World Airways, Inc. (In re Holiday Airlines Corp.),* 647 F.2d 977, 980 (9th Cir.1981) (holds that FAA merely preempts validity of recording as against third parties; failure to record with FAA did not invalidate lien as against debtor), *cert. denied,* 454 U.S. 1146, 102 S.Ct. 1009, 71 L.Ed.2d 299 (1982).

fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or

(e) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

*Id.*

Under the Illinois statutory scheme, in determining whether an agreement that purports to be a lease is actually a security agreement, courts focus on three factors:

(1) whether the "lessee" is required to make aggregate rental payments to the "lessor" equaling the cost of the leased property plus interest; (2) whether the option price to purchase the leased equipment at the end of the "lease" is nominal; and (3) whether the lease term covers the total useful life of the equipment.

*Direct Air, Inc. v. Fairchild Aircraft, Inc. (In re Direct Air, Inc.),* 189 B.R. 444, 452 (Bankr.N.D.Ill.1995) (citing *In re Hardy,* 146 B.R. 206, 209 (Bankr.N.D.Ill.1992)). "Substance rules over form and courts will look through a transfer absolute in form to find a secured transaction if that was the real intent of the parties." *Turk v. Wright & Babcock, Ltd.,* 174 Ill.App.3d 139, 142, 124 Ill. Dec. 102, 103, 528 N.E.2d 993, 994 (3d Dist. 1988), *appeal denied,* 124 Ill.2d 562, 129 Ill. Dec. 156, 535 N.E.2d 921 (1989); *see also Meeker v. Beeson,* 76 Ill.App.3d 940, 943, 32 Ill.Dec. 468, 470, 395 N.E.2d 698, 700 (5th Dist.1979)("in determining the character of an alleged lease of personal property the courts will disregard the mere form and the words and will endeavor to reach the substance of the agreement"). There is a rebuttable presumption that what is labeled or denominated a lease is in fact a bona fide lease absent compelling factors to the contrary. *Liona Corp., N.V. v. PCH Assocs. (In re PCH Assocs.),* 804 F.2d 193, 200 (2d Cir. 1986). Thus, the burden of proving whether or not the lease is bona fide rests with IDOR.

The Court disagrees with IDOR's characterization of the Aircraft Lease/Purchase Agreement as a conditional sale and finds that IDOR has failed to meet its burden of proof on this issue. After close examination of the three factors set forth in *Direct Air,* the Court finds that the Aircraft Lease/Purchase Agreement was in fact a true lease. While the inclusion of an option to purchase in a lease does not in and of itself make the lease one intended for security, where the lessee can become the owner of the leased goods for only nominal consideration at the expiration of the lease, the transaction is in substance a conditional sale. *Orix Credit Alliance, Inc. v. Pappas,* 946 F.2d 1258, 1261 (7th Cir.1991). The option price was not nominal and there is no showing that the lease term covered the useful life of the Aircraft. The fact that Chandler needed additional funds of $10 million to exercise the buy out option when the Aircraft was appraised at approximately $12.5–12.7 million does not demonstrate that the agreement was in the nature of a disguised sale. The $10 million dollar amount is not nominal nor is it substantially less than the fair market value of the Aircraft in a used condition in September 1988 when the option to purchase was exercised, three months after the Aircraft was leased by Chandler from Prewitt Leasing.

### 8. *IDOR Failed To Sustain Its Ultimate Burden of Proof*

As already noted above, the District Court held that the NPL was prima facie proof as to all elements of responsible officer liability, including willfulness. *See Stoecker,* 179 B.R. at 544. The burden then shifted to the Trustee to rebut the presumption created by a valid NPL. The presumption was rebutted by the Trustee showing that the Debtor was not in control and thus could not have voluntarily or willfully failed to pay the tax. Alternatively, the Trustee showed that even if the Debtor was in control, he reasonably relied on the legal opinion of Anderson through his agent, Pluhar. The ultimate burden of proof then shifted back to IDOR to show that the nonpayment was willful and to show that IDOR's amended claim should be allowed over the Trustee's objection. *See In re Chapman,* 132 B.R. 132, 143 (Bankr. N.D.Ill.1991) ("Once the objector has pro-

duced some evidence disputing the validity of the claim, the burden shifts to the claimant."). Based upon the above evidence, the Court holds that the Trustee has offered substantial evidence to rebut the presumption of willfulness that attached to the NPL and that IDOR has failed to refute this evidence and to ultimately sustain its burden of proof by a preponderance of the evidence that the Debtor's failure to pay the penalty for Chandler's failure to remit the alleged use tax was willful.

### D. Should the Court Equitably Subordination IDOR's Claim? [35]

#### 1. The Trustee's Request for Equitable Subordination is Properly Before the Court

Initially, the Court will address IDOR's argument that the Trustee's request for equitable subordination is not properly before the Court because the Trustee failed to file an adversary proceeding or a motion for such relief. At the initial status hearing after the remand by the District Court, IDOR agreed to waive the filing of an adversary proceeding by the Trustee provided that he file a motion seeking equitable subordination. The Trustee did not file a motion seeking equitable subordination at that time. On August 22, 1995, the parties filed a Joint Statement on Contested Matters. IDOR again took the position that the Trustee had waived the right to bring an action for equitable subordination unless a motion was promptly filed. *See* Joint Statement on Contested Matters at 8. On March 21, 1996, the Trustee presented the instant motion for summary judgment in which he seeks entry of a judgment against IDOR equitably subordinating its claim. The Trustee has not filed a separate motion seeking equitable subordination.

Consequently, IDOR contends that the issue of equitable subordination of its claim is not properly before the Court.

Procedurally, the Court notes that to the extent the Trustee has alleged that IDOR's claim should be equitably subordinated, he must normally file an adversary proceeding. *See* Fed.R.Bankr.P. 7001(8). However, a party may waive its right to object to the other party's failure to file an adversary proceeding. *See In re Pence*, 905 F.2d 1107, 1109 (7th Cir.1990). IDOR agreed to waive the formal requirement of filing an adversary proceeding provided the Trustee file a motion seeking such relief. The Trustee subsequently filed the instant motion for summary judgment, in which, among other things, he requested that IDOR's claim be subordinated. IDOR has, therefore, waived its right to object.

The Court finds that this motion is sufficient to raise the issue of equitable subordination of IDOR's claim before the Court. Moreover, the District Court's remand requires the Court to consider the issue of whether or not IDOR's claim should be equitably subordinated.[36] Thus, although the Court agrees that equitable subordination is technically not properly before this Court because the Trustee failed to file an adversary proceeding pursuant to Bankruptcy Rule 7001(8), the Court finds that IDOR has effectively waived such procedural formality and the Court may hear the issue.

#### 2. Applicable Statute and Case Law Regarding Equitable Subordination

The doctrine of equitable subordination recognizes the bankruptcy court's fundamental role as a court of equity, and permits the court to disallow or subordinate

---

**35.** Because the Court found that Chandler did not owe the tax and that even if Chandler owed the tax, the Debtor did not willfully fail to pay it, the Court need not address the issue of equitable subordination. However, in the interest of completing the record, and because the issue was directly raised and remanded by the District Court in its opinion for possible determination, the Court will discuss the issue. *See Stoecker*, 179 B.R. at 539, 544.

**36.** Specifically, the District Court stated that "[w]e remand this case to the bankruptcy court to consider whether [IDOR's] late filed claim should be subordinated under the principles of equitable subordination." *See Stoecker*, 179 B.R. at 539. Further, the District Court noted in its Supplemental Memorandum Opinion "[i]f the Bankruptcy Court allows the claim, then it must determine whether the claim should be equitably subordinated in accordance with this court's August 30, 1994 Memorandum Opinion and Order." *Id.* at 544.

claims which, if recognized, would produce unjust results. *Pepper v. Litton,* 308 U.S. 295, 304–06, 60 S.Ct. 238, 244–45, 84 L.Ed. 281 (1939); *In re Virtual Network Servs. Corp.,* 902 F.2d 1246, 1248 (7th Cir.1990); *De'Medici v. Salson Express Co. (In re Lifschultz Fast Freight),* 191 B.R. 712, 714 (N.D.Ill.1996). The doctrine is codified at 11 U.S.C. § 510(c), which provides in relevant part:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and hearing, the court may—
>
>> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest. . . .

11 U.S.C. § 510(c). The Seventh Circuit set forth three elements that a court should consider in deciding whether to equitably subordinate a claim: (1) whether the creditor engaged in misconduct; (2) whether that misconduct resulted in injury to other creditors or an unfair advantage to the miscreant; and (3) whether subordination of the debt would be inconsistent with other provisions of the Bankruptcy Code. *In re Vitreous Steel Prods. Co.,* 911 F.2d 1223, 1237 (7th Cir.1990).

Recently, the United States Supreme Court rendered its decision in *United States v. Noland,* —— U.S. ——, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996). In *Noland,* the Supreme Court held that bankruptcy courts do not have the power to categorically subordinate the government's claim for a postpetition noncompensatory tax penalty, which is entitled under the Bankruptcy Code to priority distribution, in derogation of Congress's scheme of priorities, in the absence of inequitable conduct by the government. *Id.* at ——, 116 S.Ct. at 1528. Specifically, the Court found the categorical reordering of priorities that takes place at the legislative level of consideration is beyond the scope of judicial authority to order equitable subordination under § 510(c). *Id.* at ——, 116 S.Ct. at 1528 ("Congress could have, but did not deny noncompensatory, postpetition tax penalties the first priority given to other admin-istrative expenses, and bankruptcy courts may not take it upon themselves to make that categorical determination under the guise of equitable subordination."). *See United States v. Reorganized CF & I Fabricators of Utah, Inc.,* —— U.S. ——, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996) (discusses *Noland* ).

■ The *Noland* case expressly declined to decide "whether a bankruptcy court must always find creditor misconduct before a claim may be equitably subordinated." —— U.S. at ——, 116 S.Ct. at 1528. Nevertheless, the Seventh Circuit has repeatedly held that misconduct is not necessarily required to subordinate a claim. *Virtual Network,* 902 F.2d at 1250 ("§ 510(c)(1) authorizes courts to equitably subordinate claims to other claims . . . without requiring in every instance inequitable conduct on the part of the creditor claiming parity among other unsecured general creditors."); *see also In re Envirodyne Indus., Inc.,* 79 F.3d 579, 581 (7th Cir.1996) (citing *Virtual Network* ), *cert. denied,* —— U.S. ——, 117 S.Ct. 77, 136 L.Ed.2d 36 (1996). The inquiry to be made is on a case by case basis, while focusing on the fairness to all creditors involved. *See Vitreous Steel,* 911 F.2d at 1237; *Schwab v. Aetna Bank (McDonald Creek Development Co.),* 1996 WL 139396 (N.D.Ill. March 20, 1996) (citing *Virtual Network* ).

■ IDOR contends that *Noland* effectively overrules *Virtual Network* and *Envirodyne.* The Court rejects IDOR's view that these cases are overruled by the *Noland* decision. *Noland* explicitly declined to address the issue of whether misconduct by the creditor was required to subordinate a claim. —— U.S. at ——, 116 S.Ct. at 1528. The *Noland* case instead stands for the proposition that a bankruptcy court cannot categorically subordinate claims to reorder the legislative policy embodied in the various provisions established under the Bankruptcy Code.

### 3. *The Evidence Does Not Mandate Equitable Subordination of IDOR's Claim*

The Trustee maintains that IDOR's claim should be equitably subordinated because it

violated the automatic stay on the three instances discussed above. The Trustee concludes that the facts in this case, including IDOR's alleged repeated violations of the automatic stay, coupled with its dilatory conduct in filing its claim, merit equitable subordination.

IDOR contends that its claim should not be equitably subordinated because it did not violate the automatic stay. As the Court previously discussed, the actions taken by IDOR against the Debtor were not in violation of the automatic stay. Consequently, the Trustee's argument for equitable subordination on this basis lacks merit and is rejected. The Court is further obliged to follow the law of the case, as found by the District Court, that the tardiness in the filing of IDOR's claim at bar is not ipso facto grounds for its disallowance. *See Stoecker,* 179 B.R. at 538–39.

■■■ Based upon the evidence presented and the above cited case law, the Court finds that IDOR's claim should not be equitable subordinated pursuant to § 510(c). IDOR has admitted it had knowledge of the Debtor's bankruptcy case shortly after it was filed in February 1989; IDOR timely filed other claims in the case; and IDOR, including the audit and collection employees who were investigating the Aircraft purchase, knew that the Debtor was the president and a potential responsible officer of Chandler before the June 26, 1990 claims bar date. *See Stoecker,* 151 B.R. at 997. IDOR, with such knowledge of the Debtor's bankruptcy case, did not file its proof of claim for the taxes at issue until January 21, 1992, one and one-half years after the claims bar date. It was not until February 1990, one and one-half years after the sale of the Aircraft, but within the time fixed by the Court for filing proofs of claim, an IDOR revenue auditor began investigating the sale from Prewitt Leasing to Chandler. (Tr. (Russell) 52).

The mere fact that IDOR failed to exercise due diligence in filing its claim does not, in and of itself, serve as a proper basis for equitable subordination in light of the District Court's decision. Whether IDOR filed its claim one day after the bar date or one and one-half years after the bar date, the result is the same—the claim was tardy.

The Court finds that the failure of IDOR's auditor, field collector, and employees of the NPL unit to discover the connection between the liability assessed against Chandler and the penalty assessed against the Debtor was caused principally by Chandler's failure to register the Aircraft with the Illinois Department of Transportation's Division of Aeronautics in 1988 as required by Ill.Rev.Stat., ch. 15½, ¶ 22.42 (1989). Pursuant thereto, Chandler would have been required to show that the use tax was paid or that the purchase was exempt upon registering the Aircraft as leased in Illinois. The evidence supports a finding that IDOR's failure to timely file the instant claim by the bar date was not intentional or deliberate. Consequently, the Trustee's request for equitable subordination is hereby denied.

## V. *CONCLUSION*

For the foregoing reasons, the Court hereby partially grants the Trustee's motion for summary judgment. The Court holds that Chandler did not owe a use tax. The Court further holds that even if Chandler owed the use tax, IDOR has failed to prove that the Debtor willfully failed to pay it. The Trustee's objection to IDOR's claim is, in part, sustained and the claim is disallowed. However, if IDOR held a valid claim against the Debtor, the Court would not equitably subordinate IDOR's claim under 11 U.S.C. § 510(c) in the circumstances of this case.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

### *ORDER*

For the reasons set forth in a Memorandum Opinion dated October 17, 1996, the Court hereby partially grants the motion of Thomas E. Raleigh, the Chapter 7 trustee, for summary judgment. The objection of Thomas E. Raleigh to the Illinois Department of Revenue's claim is sustained in part and the claim is disallowed. The Court holds

that Chandler Enterprises, Inc. did not owe a use tax assessed against it by the Illinois Department of Revenue. Even if Chandler owed the use tax, the Court further holds that the Illinois Department of Revenue has failed to prove that the Debtor, William J. Stoecker, willfully failed to pay the tax. Finally, if the Illinois Department of Revenue held a valid claim against the Debtor, the Court would not equitably subordinate the claim under 11 U.S.C. § 510(c).